**[J-69-2018]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**


**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 498 CAP |
| | : | |
| Appellee | : | Appeal from the Order entered on |
| | : | 12/06/2005 in the Court of Common |
| | : | Pleas, Philadelphia County, Criminal |
| v. | : | Division, dismissing the PCRA petition |
| | : | at No. CP-51-CR-0511561-1986. |
| | : | Notice of Appeal filed after remand |
| RUSSELL COX, | : | from the Order dated 11/10/2016. |
| | : | |
| Appellant | : | SUBMITTED: September 13, 2018 |


**OPINION**


JUSTICE MUNDY                                          DECIDED: March 26, 2019

Appellant, Russell Cox, appeals from the order of the Court of Common Pleas of

Philadelphia County dismissing his second petition filed pursuant to the Post Conviction

Relief Act (PCRA),[1] in this capital case.[2]


**I. Factual and Procedural Background**[3]

---

[1] 42 Pa.C.S. §§ 9541-9546.

[2] Section 9546(d) of the PCRA designates exclusive jurisdiction to this Court over appeals from orders denying relief when the petitioner received the death penalty.   42 Pa.C.S. § 9545(d); *Commonwealth v. Williams*, 196 A.3d 1021, 1024 n.1 (Pa. 2018).

[3] We have thoroughly summarized the factual history and early procedural progress of this case in two previous opinions.  *See Commonwealth v. Cox*, 686 A.2d 1279 (Pa. 1996), *cert. denied*, 522 U.S. 999 (1997); *Commonwealth v. Cox*, 863 A.2d 536 (Pa.

On May 20, 1997, Appellant was convicted of first-degree murder, criminal conspiracy, rape, and possessing an instrument of crime,[4] in connection with his participation, along with co-defendant Percy Lee, in the February 27, 1986 brutal slayings of Evelyn Brown and her seventeen-year-old daughter, Tina. Petitioner was 18 years old at the time of the crimes and Lee was 17 years old. In the subsequent penalty phase, the jury found the following aggravating circumstances: 1) the killings were committed during the perpetration of a felony; 2) the killings were committed by means of torture; and 3) Appellant was convicted of another offense for which a life sentence could be imposed. The jury also found the following mitigating circumstances: 1) Appellant's lack of a criminal record; 2) Appellant's young age; and 3) other mitigation concerning Appellant's character and the circumstances of the offense. Determining the aggravating circumstances outweighed the mitigating circumstances, the jury sentenced Appellant to death on each murder count.

Appellant received new counsel for his direct appeal in which he raised numerous issues, including various claims of ineffective assistance of counsel. This Court affirmed the judgment of sentence on December 23, 1996. *See Cox*, 686 A.2d at 1283. We denied reargument on February 18, 1997 and the United States Supreme Court denied certiorari on December 1, 1997.

Appellant filed a pro se PCRA petition on December 7, 1997. The PCRA court appointed counsel, who filed an amended petition, and two supplemental petitions. The Commonwealth filed a motion to dismiss. After hearing argument on the motion to dismiss, the PCRA court issued a notice of its intent to dismiss Appellant's PCRA petition.

---

2004). For the purpose of providing context for this appeal, we provide an abbreviated summary.

[4] 18 Pa.C.S. §§ 2502(a), 903, 3121, and 907, respectively.

The PCRA court dismissed the petition on June 18, 2002. Appellant appealed, and this Court affirmed the order of dismissal on December 22, 2004. *See Cox*, 863 A.2d at 539.

Appellant filed a second PCRA petition on February 17, 2005, alleging ineffective assistance of counsel claims and challenging his eligibility for a death sentence in light of *Atkins v. Virginia*, 536 U.S. 304 (2002) (holding that execution of mentally retarded individuals violates the Eighth Amendment's prohibition of cruel and unusual punishment).[5] The PCRA court initially determined that Petitioner's non-*Atkins* issues were facially untimely and that Appellant did not establish any exception to the PCRA's timeliness requirements. Accordingly, the PCRA court concluded it lacked jurisdiction to address the merits of those claims. The PCRA court held, however, that Appellant's *Atkins* claim met the timeliness exception of Section 9545(b)(1)(iii) and (2) in that he presented it within 60 days of the date he first could have raised the claim based on a newly recognized constitutional right when that right has been held to apply retroactively. *Atkins* was decided while Appellant's first PCRA petition was pending on appeal, and Appellant filed his second PCRA petition within 60 days of our decision in that appeal. Addressing Appellant's *Atkins* issue, the PCRA court held that Appellant merely presented a bald claim that he was intellectually disabled, failing to include any certification or offer of proof in support of the claim. The PCRA court therefore dismissed the entire PCRA petition without a hearing. In its written opinion, however, the PCRA court acknowledged this Court's intervening decision in *Commonwealth v. Miller*, 888 A.2d 624, (Pa. 2005) and welcomed a remand from this Court to afford the parties an

---

[5] Since *Atkins*, the term "mentally retarded" has been supplanted by the term "intellectually disabled." *See Commonwealth v. Bracey*, 117 A.3d 270, 271 n.2 (Pa. 2015), *abrogated on other grounds by Moore v. Texas*, 137 S. Ct. 1039 (2017). Herein we employ the newer terminology.

opportunity to create an evidentiary record in support of their positions. PCRA Ct. Op., 1/26/06, at 5.

Appellant appealed to this Court, and thereupon filed an application requesting we remand the case to the PCRA court for a full hearing on Appellant's *Atkins* claims. On July 7, 2006, we issued a per curiam order remanding the matter to the PCRA court for further proceedings. Between November 2008 and December 2013, the PCRA court held a series of evidentiary hearings. Multiple witnesses testified, including three experts on behalf of Appellant, and two experts on behalf of the Commonwealth.

Upon consideration of the evidence, the PCRA court concluded Appellant failed to establish by a preponderance of the evidence that he suffered intellectual disability sufficient to disqualify him from imposition of the death penalty. On December 9, 2016, Appellant filed a notice of appeal, and the matter returned to this Court. Appellant filed ancillary motions noting the absence of a written order or written opinion from the PCRA court. We again remanded the matter to the PCRA court, directing it to issue a written order and clarify whether it intended to file a written opinion. The PCRA court issued its written opinion on October 31, 2017, and the matter is ripe for decision.

## II. *Atkins* issue - standard of review and legal principles

Our standard of review of a lower court's determination of an *Atkins* claim is as follows:

> A question involving whether a petitioner fits the definition of mental retardation is fact intensive as it will primarily be based upon the testimony of experts and involve multiple credibility determinations. Accordingly, our standard of review is whether the factual findings are supported by substantial evidence and whether the legal conclusion drawn therefrom is clearly erroneous. We choose this highly deferential

standard because the court that finds the facts will know them better than the reviewing court will, and so its application of the law to the facts is likely to be more accurate.

*Commonwealth v. Hackett*, 99 A.3d 11, 26 (Pa. 2014) (quoting *Commonwealth v. Williams,* 61 A.3d 979, 981 (Pa. 2013)). Additionally, the scope of our review is limited to the findings of the PCRA court and the evidence of record viewed in the light most favorable to the prevailing party. *Commonwealth v. Duffey*, 889 A.2d 56, 61 (Pa. 2005).

Before proceeding to the specific evidence and the PCRA court's decision, a review of the case law following the United States Supreme Court's seminal decision in *Atkins* is useful for an understanding of the development of the principles applicable to a determination of whether a person is intellectually disabled.

In 2002, the United States Supreme Court determined in *Atkins* that the Eighth Amendment prohibition against cruel and unusual punishment precluded imposition of the death penalty on individuals with an intellectual disability. Significantly, *Atkins* left the task of defining intellectual disability for Eighth Amendment purposes to the various States in the first instance. In the absence of legislative action, this Court, in *Miller*, established a three-pronged definition. We held an individual who seeks relief under *Atkins* bears the burden to show by a preponderance of evidence that he or she is intellectually disabled as defined by either the American Psychiatric Association in its Diagnostic and Statistical Manual of Mental Disorders, (4th ed. 1992) (DSM-IV), or the American Association of Mental Retardation (AAMR), since renamed the American Association on Intellectual and Developmental Difficulties (AAIDD), in MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 1 (10th ed. 2002). From those definitions, we identified three components of proof: 1) significant below average intellectual functioning, 2) significant adaptive deficits, and 3) onset by age 18. *Id.* at 153.

In further clarifying these components based upon the medical consensus reflected in the DSM-IV and AAIDD, we noted that a limitation in intellectual capability amounting to disability is reflected by IQ scores of at least two standard deviations (30 points) below the mean (100), taking into consideration any standard error of measurement [SEM][6] for the assessment instrument employed. *Id.* at 154. We explained that, under the AAIDD or DSM-IV, these results are not sufficient in and of themselves but must be considered in conjunction with limitations in the subject's adaptive behavior in areas such as conceptual, social, and practical skills. *Id.*

In subsequent cases, we have applied these standards. In *Williams*, we affirmed a PCRA court's finding that Williams was intellectually disabled based on non-diagnostic childhood testing, and notwithstanding Williams had strong skills in certain distinct categories. *Williams*, 61 A.3d at 240-42. In *Hackett*, we reversed the PCRA court's determination that Hackett was intellectually disabled because the court equated borderline intellectual functioning with intellectual disability and because the record failed to show significant deficits in adaptive functioning. *Hackett*, 99 A.3d at 35. In *Bracey*, we affirmed the PCRA court's finding of intellectual disability. *Bracey*, 117 A.3d at 76. Therein we found support for the court's finding that proration of partial test scores is

---

[6] We have previously explained the definition of SEM as follows:

> The SEM is 'a unit of measurement: 1 SEM equates to a confidence of 68% that the measured score falls within a given score range, while 2 SEM provides a 95% confidence level[.]' *Hall,* at 1995 (citation omitted). The 'given range' for 1 SEM is thus 5 points, within 2 ½ above or below the articulated IQ score; the range for 2 SEM is 10 points, within 5 points above or below the IQ score. 'The larger range logically engenders more confidence that it encompasses the relevant IQ.

*Bracey*, 117 A.3d at 274.

generally inappropriate for diagnostic purposes. *Id.* at 284. Also in *Bracey*, we cited with limited approval the case of *Ex Parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004).[7] *Id.* at 286, *See also Hackett*, 99 A.3d at 44 (Castille, C.J. concurring), *Commonwealth v. DeJesus*, 58 A.3d 62 (Pa. 2012). We held that consideration of the factors enumerated in *Briseno* was discretionary with a PCRA court in addressing claims of malingering by a defendant asserting an *Atkins* claim. *Id.* at 287. Ultimately, we concluded the issue was not central to the PCRA court's findings. *Id.*

---

[7] The *Briseno* court deemed that an inquiry into adaptive behavior criteria was highly subjective and advanced a series of factors for courts to consider in evaluating evidence. Those factors consist of the following:

> Did those who knew the person best during the developmental stage—his family, friends, teachers, employers, authorities—think he was mentally retarded at that time, and, if so, act in accordance with that determination?
>
> Has the person formulated plans and carried them through or is his conduct impulsive?
>
> Does his conduct show leadership or does it show that he is led around by others?
>
> Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?
>
> Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?
>
> Can the person hide facts or lie effectively in his own or others' interests?
>
> Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?

*Briseno*, 135 S.W.3d at 8-9.

In 2014, the United States Supreme Court decided *Hall v. Florida*, 572 U.S. 701 (2014). Therein the Court determined that while *Atkins* afforded the States leeway in applying the decision in *Atkins*, the States did not have unfettered discretion and must be guided by the medical community's diagnostic framework. *Id.* at 721. Further, the Court in *Hall* held that IQ scores must be viewed accounting for the SEM applicable to the testing used. *Id.* at 722-23. In *Brumfield v. Cain*, 135 S. Ct. 2269 (2015), the Court reaffirmed the holding in *Hall* that an IQ score of 75 alone, cannot foreclose further inquiry into other prongs. *Brumfield*, 135 S. Ct. at 2277-78. The Court also found the record demonstrated Brumfield raised a question of adaptive function sufficient to require a hearing on his *Atkins* claim. *Id.* at 2283.

Most recently, the United States Supreme Court decided *Moore* on March 28, 2017. In the State proceedings, the trial court determined Moore to be intellectually disabled and ineligible for the death penalty. The State appealed, and the Texas Court of Criminal Appeals reversed, criticizing the habeas judge's reliance on the most current AAIDD diagnostic test rather than on the *Briseno* factors. Moore appealed to the United States Supreme Court. The United States Supreme Court reversed and remanded, rejecting the Texas Court of Criminal Appeals' analysis as flawed in a number of ways. The Court again re-affirmed its holding in *Hall*. "*Hall* indicated that being informed by the medical community does not demand adherence to everything stated in the latest medical guide. But neither does our precedent license disregard of current medical standards." *Moore,* 137 S. Ct. at 1049. The Court also explained that *Hall* and *Brumfield* established that IQ test scores must be considered while accounting for any SEM. *Id.* at 1043. It further explained that "the presence of other sources of imprecision in administering the test to a particular individual . . . cannot narrow the test-specific standard error range." *Id.* at 1049. The Court also faulted the Texas court's focus on Moore's adaptive strengths.

It noted, "[c]linicians . . . caution against reliance on adaptive strengths developed in a 'controlled setting' as a prison surely is." *Id.* at 1050. The Court disapproved of the Texas court's conclusion that Moore's traumatic childhood contraindicated a finding of disability when, again, clinicians identify traumatic experiences as a risk factor for intellectual disability. *Id.* at 1051. Finally, the Court held that the *Briseno* factors impermissibly substitute a political consensus on who should be exempt from the death penalty for objective medical standards. *Id.* The Court noted that the *Briseno* factors represent an outlying position among the states, citing this Court's *Bracey* decision as another such outlier in authorizing consideration of the factors. *Id.* at 1052. The Court reaffirmed its central tenet that "[t]he medical community's current standards supply one constraint on States' leeway [in enforcing *Atkins*]. Reflecting improved understanding over time . . . current manuals offer 'the best available description of how mental disorders are expressed and can be recognized by trained clinicians.'" *Id.* at 1053 (citations omitted). [8]

With this background in mind, we proceed to summarize the evidence presented in the instant matter.

### III. The *Atkins* hearing testimony

---

[8] Following the United States Supreme Court's remand in *Moore*, the Texas Court of Criminal Appeals again determined that Moore was not intellectually disabled, and was therefore eligible for the death penalty. Moore appealed. On February 19, 2019, the United States Supreme Court decided *Commonwealth v. Moore*, 586 U.S. ___, 2019 WL 659798, (2019) (per curiam). The Court reiterated the key holdings from its 2017 decision, and noted the Texas Court of Criminal Appeals' new determination was inconsistent with that decision. The Court found the Texas Court of Criminal Appeals repeated the same errors of analysis that had been previously rejected. Excising the faulty analysis, the Court found there "leaves too little that might warrant reaching a different conclusion than did the trial court." *Id.* at *5. Accordingly, it reversed the order of the Texas Court of Criminal Appeals.

Appellant presented the testimony of various lay witnesses[9] about their recollections of Appellant's chaotic upbringing, his abilities in performing tasks, following directions, interacting with peers, and other anecdotal information about Appellant throughout the years. Dolores Jones, Appellant's mother, testified that Appellant was the oldest of her 10 children, and that she was 17 years old at the time of his birth. N.T., *Atkins* Hearing 11/12/08, at 28-29. Jones drank regularly during her pregnancy. *Id.* at 29-30. The year after Appellant's birth, Jones married William Jones, with whom she had three more children in as many years. *Id.* at 46-47. In 1972, Jones stabbed and killed William Jones. The children were in the home at the time. *Id.* at 51. Jones was convicted of voluntary manslaughter and was sentenced to 12 years' probation. *Id.* By 1980, Jones had six more children with two different men. *Id.* at 52-53. At some point, Appellant went to live primarily with his paternal grandmother.

In general, the family witnesses described Appellant as slow relative to children of his age. *Id.*,11/12/08, at 32-33; *id.*,11/13/08, at 155; *id.*,1/9/09, at 6. Peers picked on and bullied him for being slow. *Id.*, 11/12/08, at 35-36, 147, 162-63; *id.*,1/9/09, at 8, 33, 47. Appellant did not comprehend his schoolwork and had his homework done for him. *Id.* at 34-35, 165. Appellant could only tell time from a digital display. *Id.*, 11/12/08, at 37. Appellant was largely a follower, particularly in his relationship with the co-defendant. *Id.*, 11/12/08, at 145, 192; *id.*,11/13/08, at 165; *id.*,1/9/09, at 46. He generally associated with younger children. *Id.*,1/9/09, at 30-31. Appellant needed prompting to maintain personal hygiene. *Id.*, 11/12/08, at 167-68, 189; *id.*,11/13/08, at 189; *id.*,1/9/09, at 9. Appellant could not read well. *Id.*, 11/12/08, at 165, 190; *id.*,11/13/08, at 168; *id.*,1/9/09, at 32, 47-

---

[9] These witnesses included, Dolores Jones, Appellant's mother; Leslie Murphy, the mother of Appellant's three children; Kevin Moore, Appellant's cousin; Linston Cox, Appellant's Uncle; Julius Moore, Appellant's Uncle; Tameka Stevens, Appellant's childhood friend; and Lawrence, Tanya, and James Jones, Appellant's half-siblings.

48. Adults avoided sending him on errands that required reading or making change, which he was unable to perform. *Id.*, 11/12/08, at 36-37, 169, 189; *id.*,11/13/08, at 193; *id.*,1/9/09, at 10.

Otis Peterkin, a fellow inmate at State Correctional Institutes at Huntington, Pittsburgh, and Greene, testified about Appellant's limited ability to read or write, and about his assistance to Appellant in drafting and reading legal correspondence and grievances. *Id.*, 11/12/08, at 222-234. He testified about his efforts to teach Appellant to copy and write the alphabet and then copy sentences, so some of the documents could appear in Appellant's handwriting. *Id.* Peterkin also connected Appellant with another inmate, who had just passed his GED exam, to help him with his educational aspirations. *Id.* at 238-240.

The Honorable William Meehan, Jr., who was Appellant's trial counsel before his eventual ascension to the bench of the Court of Common Pleas, testified. He related that after he represented Appellant for a time and his contact with Appellant was more frequent and prolonged, he discerned that Appellant's passive, mild, and cooperative manner masked a lack of comprehension of the proceedings and various aspects of the trial and defense. *Id.*, 11/13/08, at 5. Attorney Meehan was also concerned given the academic records he reviewed. *Id.* at 18-19. Appellant repeated the first grade, and twice failed the seventh grade before dropping out of school. *Id.* Accordingly, Attorney Meehan, with leave of court, arranged for an evaluation of Appellant's intellectual functioning, the results of which formed the basis for a midtrial suppression motion, and for mitigation during the penalty phase of the trial. *Id.* at 22-23. Attorney Meehan engaged the services of Mark

Molyneaux[10], who administered a Weschler Adult Intelligence Scale Revised [WAIS-R] test, which yielded an overall score of 69.

Appellant offered the testimony of two expert witnesses in his initial presentation. Dr. Jethro Toomer, a clinical and forensic psychologist, explained that he was asked to offer an opinion regarding Appellant's adaptive functioning and the relation of any deficits to a diagnosis of intellectual disability. To do so, he reviewed prior evaluations, court records, school records, Department of Correction (DOC) records, and family affidavits. Dr. Toomer also evaluated Appellant using the Scales of Independent Behavior Revised (SIB-R). He performed the SIB-R with Appellant, Appellant's mother, and Appellant's grandmother. Dr. Toomer explained the SIB-R is an accepted tool to evaluate adaptive functioning. *Id.* at. 63-64. Its categories correspond to the social, conceptual, and practical skill areas identified in the AAMR and similar designations in the DSM-IV. *Id.* at 64-68. The SIB-R provides a global assessment appropriate for diagnostic purposes, where other tools may have a different focus, such as treatment, or programming. The assessment was administered in long form individually with Appellant's mother and grandmother because they were in a position to observe Appellant at the respective ages he was while he resided with each of them. The measure of adaptive functioning is made relative to the overall community, not an isolated controlled environment, such as prison. The short form test administered to Appellant reflected a broad age equivalent independent functioning of nine years and two months. *Id.* at 78. To meet the definition of intellectual disability, deficits in at least two areas identified in the DSM-IV are required. Dr. Toomer testified his evaluation revealed deficits in 14 areas. *Id.* at 64- 65. Dr. Toomer noted that school records, which showed problems with attentiveness, focus,

---

[10] Dr. Molyneaux, a psychologist, had a master's degree at the time he was retained, earning his doctorate sometime thereafter.

achievement, and personal relationships, confirmed his findings. *Id.* at 116-122. Dr. Toomer also found the records of the DOC to be corroborative, including an entry by Dr. Dorothy Gold, a DOC managing psychologist, that Appellant was "known to be mentally retarded." *Id.* at 125. From his assessment and the information reviewed, Dr. Toomer concluded, with a reasonable degree of professional certainty, that Appellant had a lifelong history of impairment of adaptive functioning.

Dr. George McCloskey, psychologist and Director of Psychological Research at the Philadelphia College of Osteopathic Medicine, reviewed the various tests administered to Appellant and the available records in order to form an opinion as to whether Appellant met the definition for intellectual disability. *Id.*, 11/9/09, at 19-20. He explained the WAIS-R test performed by Mr. Molyneaux resulted in a verbal sub-score of 72 and a performance sub-score of 68 for a composite score of 69. *Id.* at 21. He noted Mr. Molyneaux described the testing conditions in detail, expressing confidence in the validity of the test's administration. *Id.* at 35. The WAIS-R testing administered in Prison the following year consisted only of the verbal component and yielded a sub-score of 72, consistent with the earlier sub-score result. *Id.* at 22. Dr. McCloskey also reviewed the result reached by a WAIS-III test administered by Dr. Stephen Berk in 2005. *Id.* at 24. These tests have a SEM of plus or minus five points.

Dr. McCloskey explained that the tests are periodically revised and re-normed to reflect currency with the knowledge and circumstances of the general public. *Id.* at 37-38. The 1987 and 1988 tests used a version re-normed in 1978 and the 2005 test employed a version re-normed in 1995.[11] *Id.* at 40-41. Dr. McCloskey cited studies discussing the "Flynn Effect" which measures the overall drift of test scores in the

---

[11] The 1978 re-norming resulted in version II of the test later revised as WAIS-R and the 1995 re-norming resulted in version III.

population between each re-norming of the measuring tests. *Id.* at 38-39. The WAIS-IV manual contains data for this effect between the -III and the current -IV versions reflecting an increase of about .3 point per year. *Id.* at 57-58. Although acknowledging that it is not always applied, Dr. McCloskey opined that best practice would be to account for this effect with a downward adjustment of the scores, which in the three subject tests would mean a three point downward adjustment. *Id.* at 65-67.

Dr. McCloskey also testified that the fact Appellant achieved his GED in prison did not disprove the diagnosis of intellectual disability. *Id.* at 72. He explained that Appellant only passed on his second try after 14 years of preparation in a structured supportive setting. He opined that his review of the essay portion of Appellant's GED exam reflects a 4th to 5th grade level. *Id.* at 72-73. He also noted that the areas of improvement in the 2005 IQ test coincided with areas relevant to his GED study. *Id.* at 84-85. There was little or no improvement in conceptual relations, comprehension, social reasoning, or understanding communication. *Id.* Dr. McCloskey opined that the failure of Appellant's schools to designate him as in need of special education did not negate a diagnosis of intellectual disability, hypothesizing a number of possible reasons. *Id.* at 99-101. Dr. McCloskey also relied on the findings of Dr. Toomer and the DOC records to confirm his conclusions that Appellant meets the definition for a diagnosis of intellectual disability. *Id.* at 106.

The Commonwealth offered the testimony of Dr. Paul Spangler, a psychologist employed with the Philadelphia Department of Mental Retardation. Dr. Spangler disputed that IQ tests closer to the age of 18 had greater significance than did ones performed more recently. *Id.*, 11/16/09, at 16-17. He questioned whether the conditions present during Mr. Molyneaux's testing might call into question the result. *Id.* at 19-20. He noted the test was performed at night in the midst of Appellant's trial. *Id.* He further noted that

Appellant did not have his eyeglasses at the time so that he was described as having to squint. *Id.* at 21-22. Dr. Spangler opined that this might have depressed the result. *Id.* He also noted that the 1987 test omitted, without explanation, a "block design" segment. The comparable segment in the 2005 test showed a score in the normal range. He opined that the omission might also have skewed the final score. *Id.* at 23-24. Dr. Spangler also stated that he would not adjust a test score based on the Flynn Effect, but would address it in the comments if relevant to the age of the test used. *Id.* at 31. Dr. Spangler also questioned Dr. Toomer's result of the SIB-R. He explained that the computer tabulation assesses for current age, while Dr. Toomer geared the questioning to earlier ages. *Id.* at 43. He stated the SIB-R is not a developmental scale but a present assessment. *Id.* Dr. Spangler also questioned the relevance of the school records in this case, which reflected Appellant's extensive absences and his unstable home life that could account for his failure to achieve. *Id.* at 61-62, 68-69. Dr. Spangler also noted portions of the DOC records that reflected Appellant with normal intelligence and adaptations, such as maintaining a job involving an 18-step protocol, and passing a GED exam. *Id.* at 76-77. Dr. Spangler expressed an opinion that Appellant is not intellectually disabled.

The Commonwealth also offered the testimony of Dr. Leigh Hagan, a clinical and forensic psychologist, to offer an opinion relative to methods and ethics. Dr. Hagan testified that it was not accepted practice to apply any correction for the Flynn Effect in scoring IQ tests. *Id.*, 9/16/10, at 41-42. He noted the goal is to use the most current version of the testing instrument and restrict any consideration of the Flynn Effect to the comments. *Id.* He noted data showed the effect was neither constant nor predictable. He also testified that it is the general practice to rely on the most recent testing. *Id.* at 83.

He acknowledged that the WAIS-IV manual contains data for the Flynn Effect but has no instructions to adjust scoring. *Id.* at 91-92.[12]

In rebuttal, Dr. Kathleen Ross-Kidder, a clinical psychologist on the faculty of Georgetown and George Washington Universities, testified that the Flynn Effect is taught as part of the curriculum and that it would be reliable to use in scoring adjustment. *Id.*, 12/2/13, at 54-56. She also met with Appellant to achieve a general clinical impression through conversation and picture test cards used only as an assessment aid. *Id.* at 58-59. Dr. Ross-Kidder testified that based on data reflecting requests for special accommodation in taking the GED, which includes requests based on intellectual disability and attendant pass rates, it is probable that intellectually disabled individuals have passed the GED test. *Id.* at 37-39, 45. However, she could not cite a specific example. Dr. Ross-Kidder concluded that Appellant possessed limited vocabulary, areas of interest, and perception, and that he displayed no indication of higher cognitive functioning. *Id.* at 59.

**IV. The PCRA court opinion**[13]

The PCRA court credited the testimony of Dr. Spangler that the conditions surrounding the administration of the 1987 WAIS-R test depressed the score. The court noted that Appellant's expert witnesses acknowledged that such conditions could affect

---

[12] The Commonwealth also offered testimony and stipulations from DOC personnel attesting that the GED was appropriately administered and no special accommodation requested.

[13] As observed by both parties, the PCRA court's written opinion borrowed significantly from the Commonwealth's post-hearing memorandum, adopting its arguments and incorporating sections of its language. *See* Commonwealth's Brief at 20-21 n.6 (listing portions of the Opinion adopting corresponding portions of the memorandum from which language was incorporated verbatim).

results. The court also found that the fact Appellant did not have his glasses during the testing may have affected the results. Additionally, the court credited Dr. Spangler's opinion that the omission of the block design subtest, coupled with the results for that subtest in the 2005 test, further called into question the 1987 results.

The court determined that the three verbal subtests performed by the DOC were irrelevant. The WAIS-R manual instructs for proration in instances of five verbal subtests, but not for only three. Accordingly, the court found the test results could not be used to assess a full-scale IQ score. The Court found the 2005 WAIS-III test to be the only reliable result, which, when viewed with consideration for the plus or minus 5-point SEM, does not fall into the definition of intellectual disability. All performance subtests were administered with the exception of the optional block assembly, and 13 verbal subtests, so the score did not need to be pro-rated. The court also favored the 2005 score because it was from the most recent version of the WAIS test. The court also determined that adjustment of scores to account for the Flynn Effect is not standard practice.

The PCRA court next concluded that Appellant did not demonstrate significant deficits in adaptive functioning. The court found significant the fact that school authorities never identified Appellant as possessing learning disabilities despite a system in place to do so. The court noted this was despite the records showing numerous contacts with the family regarding Appellant's attendance, need for glasses, and other issues. The court concluded the poor performance and achievement were due to excessive absences and do not support an inference of intellectual disability. The court noted that Appellant's California Achievement Test scores were consistently above the 2% range in which individuals with intellectual disability score.

The PCRA court found the testimony of Appellant's family and friends to be unreliable. The court concluded the individuals were biased, with an interest in the

outcome; there were questions about whether they had assistance in preparing affidavits; and their testimonies contained inconsistencies and selective memory.

The court discounted the relevance of Dr. Toomer's evaluation. The court credited Dr. Spangler with greater expertise and objectivity. Additionally, the court found that there were errors in the administration and scoring of the SIB-R test. It faulted Dr. Toomer's failure to coordinate the respective responses from Appellant, his mother and grandmother. The lack of coordination made it impossible to know who gave which response. The court also found Dr. Toomer's assessment of historical adaptive functioning inconsistent with the current assessment the SIB-R is designed to assess. Even applied retrospectively, the court found Dr. Toomer failed to specify the timeframe to which particular questions pertained, making any conclusion drawn from those responses unreliable. The court noted that Dr. Toomer concluded that Appellant scored an adaptive functioning of nine years two months. However, Dr. Toomer did not specify the point in time to which that score pertained, responding only that it applied "prior to age 18." Additionally, the court found that Dr. Toomer did not score the test in accordance with the SIB-R manual and instructions. For example, rather than instructing the respondents to estimate a level of performance for a task, they had not observed or performed before, Dr. Toomer entered a zero score. Similarly, some questions were left blank, contrary to the instructions, and given a zero rather than an estimated score. The court also found that inconsistent patterns of responses in the test indicated problems with its administration.

The PCRA court found that DOC records do not support a showing of significant deficits in adaptive functioning. Various mental status reviews from 2000 and 2003 mark Appellant's intelligence as normal or between normal and low, and none indicate intellectually disabled. The reports also indicate normal for other categories, including

perception, insight, judgment, and memory.  The court noted that Appellant navigated the procedure for numerous grievances while in prison.  The court found that Appellant's ability to perform a job cleaning up blood and bodily fluid spills, which entails a specific multi-step protocol, belied any deficit in adaptive functioning.

In light of these findings, the court also concluded that Appellant failed to establish the onset of any intellectual disability prior to age 18.  As additional support for its conclusion, the court considered the *Briseno* factors.  Particularly, the court found the first factor significant, *i.e.*, whether witnesses who knew the defendant expressed and acted on their concerns about the defendant's intellectual functioning at the time as opposed to merely testifying about their current recollection of those disabilities.

The PCRA court credited Appellant's attainment of his GED as contraindicating intellectual disability.  The court noted this to be an issue of first impression in this Commonwealth, but cited cases from other jurisdictions that noted the earning of a GED is incompatible with a claim of intellectual disability.  PCRA Ct. Op. at 55-57 (collecting cases).  The court outlined the standards and procedures for the GED as further evidencing this incompatibility.  The court noted Appellant's particular progress in preparing for each taking of the test and his results.

Based on these findings, the PCRA court concluded Appellant failed to prove by a preponderance of the evidence that he met the diagnostic definition for being intellectually disabled.  Accordingly, the court dismissed Appellant's PCRA petition relative to his *Atkins* claim.

## V. Appellant's *Atkins* argument

Appellant argues the PCRA court erred in its consideration of the evidence presented during the *Atkins* hearings in four ways: 1) by applying the since discredited *Briseno* factors; 2) by focusing on Appellant's adaptive strengths instead of the medically required focus on deficiencies; 3) by considering Appellant's adaptation to his life in prison; and 4) by favoring expert opinions offered by witnesses who never met with or personally evaluated Appellant. Appellant argues the PCRA court abused its discretion by discounting the 1987 and 1988 tests, based on perceived flaws in their administration, to hold that the 78 full-scale score from the 2005 test precluded a finding the Appellant met the definition for intellectual disability. Appellant notes that the United States Supreme Court in *Hall* rejected the notion of using an IQ score as itself conclusive in determining the existence or absence of intellectual disability. The cases, Appellant argues, require that a determination be guided by established medical practice in accordance with core national consensus. Appellant noted this Court in *Miller* similarly eschewed relying on a particular cutoff IQ score as conclusive, holding that the practice effect and the SEM may encompass scores of 78 and 81 by individuals with intellectual disability. *Miller*, 888 A.2d at 631-32.

Appellant argues that the PCRA court's determination, that the conditions under which the 1987 test was administered as compromising the result, ignored Mr. Molyneaux's comments attendant with his report that the conditions were satisfactory and the results accurately reflected Appellant's functioning. Mr. Molyneaux was the individual actually present and in a position to assess those conditions. Further, the PCRA court's reliance on the fact Appellant was not wearing glasses during the 1987 testing was misplaced according to Appellant. He notes Dr. McCloskey testified that there is no reading required for the WAIS-R. The fact Appellant may have needed to squint to see testing materials does not negate the comments by Mr. Molyneaux in his report that the

testing conditions were satisfactory. Further, Appellant notes that Dr. Spangler testified that omission of a single subtest does not invalidate a result. Therefore, Appellant contends, the PCRA court abused its discretion in adopting wholesale the Commonwealth's parsed criticism of the 1987 test to conclude the result unreliable.

Appellant similarly argues the court's rejection of the DOC testing as irrelevant is flawed. Appellant notes that Dr. McCloskey agreed the limited testing performed would not independently form a basis for an overall IQ score. However, the results of the subtests are valid measures, relevant as corroboration of the comprehensive test just a year earlier. Appellant argues the scores show consistency with Appellant's 1987 results on the same subtests, further supporting the reliability of those results. Therefore, Appellant argues, the court erred in isolating the 2005 test results as the only reliable evidence of Appellant's intellectual functioning. Appellant maintains this finding contradicts the record and controlling precedent.

Appellant references comments in the report by Dr. Berk, who administered the 2005 test, that the score "overstates [Appellant's] actual intellectual status" as a result of "increased stimulation while in prison." Appellant's Brief at 16 (quoting PC Ex.C-19 at 3). Appellant notes Dr. Berk's further observation that Appellant "knows words, but not their meanings. He also doesn't understand information very well." *Id.* Dr. Berk concluded "[Appellant] still has significantly sub-average intellectual functioning." *Id.* Appellant argues Dr. Berk's recognition of the effect of the prison environment is consistent with Dr. McCloskey's explanation of how Appellant's years in preparation for the GED could result in his passing despite intellectual disability. Appellant argues the PCRA court's failure to consider Dr. Berk's own observations and impressions of the 2005 test results did not comport with professional norms of the medical and psychological fields.

Appellant also claims the PCRA court abused its discretion in rejecting consideration of the Flynn Effect as irrelevant. Appellant argues the notion that over time the IQ score in the population increases unless the test is updated is well recognized in the profession. As the Court in *Hall* recognized, IQ testing is imperfect. *Id.* at 18 citing AAIDD, Intellectual Disability: Definition, Classification, and Systems of Support (11th ed. 2010) at 37-38 ("best practices require recognition of a potential Flynn Effect when older editions of an intelligence test (with corresponding older norms) are used in the assessment or interpretation of an IQ score"). *See also* DSM-V at 37 ("Factors that may affect [IQ] test scores include practice effects and the 'Flynn Effect' (i.e., overly high scores due to out-of-date test norms)."); AAIDD-11th, ch. 4 at 35-38). Appellant cites several cases approving consideration of the Flynn Effect. *Id.* at 18-19. Finally, Appellant notes that even the Commonwealth's experts acknowledged the underlying validity of the Flynn Effect but differed as to its application. Dr. Spangler testified that although he would not adjust the score of a test, commenting on the Flynn Effect in the accompanying comments would be appropriate to aid in its interpretation. *Id.* (citing N.T., 11/16/09, at 32.) Dr. Hagan made a similar representation. *Id.* (citing N.T., 9/16/10, at 42). Appellant notes that the PCRA court's reliance on *Commonwealth v. Riccardi*, 3649 of 2009 (Luzerne County CCP June 6, 2011) is inapt. While the court in that case refused to apply a mathematical adjustment for the test scores, the court did accept the validity of the Flynn Effect and acknowledged that it informed the court's conclusion. Also, *Riccardi* was decided before *Hall* which admonished a failure to account for a confidence interval in the administered tests. For these reasons, Appellant asserts the PCRA court abused its discretion in completely rejecting the relevance of the Flynn Effect relative to the interpretation of 2005 test results.

Appellant next argues the PCRA court's analysis of the evidence concerning Appellant's adaptive functioning is contrary to controlling precedent. In *Williams*, the United States Supreme Court held that, in accordance with professional standards, the focus for this prong of the test should be on the existence of adaptive weaknesses, if any, rather than strengths. Appellant argues the PCRA court essentially relied on specific achievements to evidence a lack of adaptive deficits. Appellant recounts the evidence from the lay witnesses, school records, and DOC records describing Appellant's pervasive and continuing adaptive difficulties. Appellant contends these accounts are consistent with and corroborative of each other. The DOC records included evaluations that determined Appellant to be "an inarticulate, concrete and intellectually impoverished man," and "was known to be mentally retarded." *Id.* at 27 (citing N.T., 11/13/08, at 125, 143). In addition, the PCRA court's reliance on Appellant's filing of numerous grievances ignored the testimony of Peterkin that he assisted Appellant in filling out that paperwork. Appellant argues the PCRA court erroneously focused on what Appellant could do, notwithstanding that a deficit need not be shown in all areas. This is why the United States Supreme Court precedent requires focus on deficits. In the same vein, Appellant argues the PCRA court abused its discretion in concluding the fact Appellant passed a GED exam precludes a diagnosis of intellectual disability. Besides erroneously focusing on capabilities rather than deficits, Appellant contends the court's position ignores the totality of the circumstances surrounding Appellant's taking of the exam. After receiving assistance for seven years in preparation, Appellant failed the exam on his first attempt. After another seven years, Appellant retook the exam and passed. As Dr. McCloskey testified, the areas where Appellant improved in his 2005 IQ test coincided with the areas impacted by this extensive preparation for the GED.

Appellant asserts that a formal assessment such as the SIB-R is not required to establish adaptive deficits. A review of the totality of the data is required, which Dr. Toomer performed in his review of the school and DOC records and the affidavits from individuals with personal knowledge of Appellant. Thus, Appellant argues that even discounting the result of the SIB-R as a specific measure of Appellant's deficits, the record is full of evidence supporting the conclusions of Drs. Toomer, McCloskey, and Ross-Kidder.

Finally, Appellant argues that in light of *Moore,* the PCRA court erred in its consideration of the *Briseno* factors to discount the evidence of the lay witnesses and the import of that evidence in showing Appellant's adaptive deficits and the onset of his intellectual disability long before he turned 18 years old.

## VI. The Commonwealth's *Atkins* argument

In its brief, the Commonwealth states it has changed its position on Appellant's *Atkins* claim in light of recent United States Supreme Court precedent. The Commonwealth notes that the PCRA court's written opinion borrows significantly from its post-hearing legal memorandum, including the Commonwealth's urging of consideration of the *Briseno* factors, notwithstanding the United States Supreme Court decision in *Moore* several months earlier. The Commonwealth notes that during the pendency of this case, the United States Supreme Court decided the series of cases discussed above, further refining the contours of the holding in *Atkins.* The Commonwealth concedes its post-hearing memorandum and argument did not reflect the principles so clarified in *Hall,* *Brumfield* and *Moore.* By adopting its argument, the Commonwealth contends the PCRA court failed to consider three fundamental propositions advanced in those cases. First,

in evaluating whether an individual is intellectually disabled, there should not be an overemphasis on IQ test scores. Second, in assessing an individual's adaptive behavior, courts should focus on the existence of any adaptive deficits and not rely on adaptive strengths to deny relief. Third, courts should be guided by the prevailing diagnostic and assessment tools and principles rather than lay perceptions of what constitutes intellectual disability.[14]

The Commonwealth particularly highlights the similarities between the facts and expert opinion evidence in this case with facts and expert opinion evidence in *Moore*. Moore's IQ scores included one score of 78 with none under 70. The Commonwealth also deems comparable its witnesses' overemphasis on Appellant's strengths, including passing a GED exam, and maintaining prison employment, with how the State's expert witness in *Moore* "emphasized Moore's adaptive strengths in school, at trial and in prison." Commonwealth Brief at 31 (quoting *Moore*, 137 S. Ct. at 1047). The Court in *Moore* held that an IQ score in the ranges present in that case did not end the inquiry, reaffirming *Hall*. It is necessary to consider other evidence of intellectual disability, particularly adaptive deficits, in line with accepted principles of the medical community. In this case, the Commonwealth maintains that the adaptive strengths focused on by the PCRA court are comparable to those focused on by the court in *Moore*, including the fact Appellant was never placed in a special needs class, and his ability to perform menial labor.

The Commonwealth also concedes that the PCRA court's reliance on the *Briseno* factors compels reversal. Here, the PCRA court relied on the apparent failure of the lay witnesses to act on their asserted perceptions of Appellant's deficits to discount the

---

[14] That is not to say that lay testimony about factual observations of an individual's behavior is not relevant to an expert's assessment of behavioral deficits.

existence of those deficits. This is squarely at odds with *Moore's* admonition against focus on non-clinical lay perceptions. The Commonwealth notes that the absence of services or intervention in Appellant's circumstances is not surprising and is not a fair barometer of whether he was intellectually disabled. The Commonwealth cites the AAIDD summary of the challenges faced by individuals with intellectual disability. "People with [intellectual disability] experience great challenges in their learning and development, frequently have difficulty participating in activities of daily life in their communities, and are particularly vulnerable to exploitation by others." *Id.* at 38 (quoting Intellectual Disability, Definition, Classification, and Systems of Support (11th Ed. 2010) at 110). This, the Commonwealth states, is consistent with the description of Appellant's life prior to his arrest. The Commonwealth, on reevaluating the evidence, now contends Appellant met his burden in this case, and urges this Court to grant *Atkins* relief.[15]

## VI. *Atkins* discussion

Initially, we note this Court has recently explained that confessions of error by the Commonwealth are not binding on a reviewing court but may be considered for their persuasive value. *Commonwealth v. Brown*, 196 A.3d 130, 146-149 (Pa. 2018).[16]

The *Atkins* hearing in this case spanned six years. After the conclusion of testimony, but before the PCRA court issued its decision orally, the United States

---

[15] The Commonwealth notes the outstanding disagreements among the experts on the issue of the Flynn Effect. However, the Commonwealth also maintains that, in light of other errors in the PCRA court's analysis, it is unnecessary for this Court to resolve the issue of the relevance of evidence of the Flynn Effect in order to grant Appellant *Atkins* relief.

[16] In contrast to the Commonwealth's position in *Brown*, the Commonwealth here does not argue that its current position binds this Court, or that it constitutes an unreviewable exercise of prosecutorial discretion.

Supreme Court issued its decisions in *Hall* and *Brumfield*. After the PCRA court's oral ruling, but before its written opinion, the United States Supreme Court issued its decision in *Moore*. The PCRA court references *Hall* in its opinion, but not *Brumfield* or *Moore*. As discussed above, the chief import of these cases is the central role of the societal consensus to rely on medical and professional expertise in defining and diagnosing intellectual disability. The laws and practices disapproved in those cases deviated from that central principle by engrafting arbitrary or extraneous considerations into the analysis. Thus, *Hall* overturned a law that over-emphasized IQ test results where the medical consensus includes scores above 70 as consistent with intellectual disability where accompanied by severe adaptive behavior problems. *Hall*, 134 S.Ct. at 1994-95. In *Brumfield* the Court reaffirmed the principle in *Hall*, and also disapproved an analysis that factored an individual's adaptive strengths to preclude a hearing on the existence of adaptive deficits. *Brumfield*, 135 S. Ct. at 2279-80. Additionally, the Court in *Moore* condemned the same practices discussed in *Hall* and *Brumfield* and particularly disapproved reliance on the *Briseno* factors as an attempt to impose a consensus of the citizenry about who should be eligible for the death sentence rather than criteria accepted in the professional and medical community. *Moore*, 137 S. Ct. at 1053.

The PCRA court also discounted the results of the 1987 WAIS-R test based on the possibility that testing conditions affected the result. In *Moore*, the State argued particular circumstances justified disregarding the lower end of the SEM score. However, *Moore* has clarified that "other sources of imprecision … cannot *narrow* the test-specific standard error range." *Id.* at 1049 (emphasis in original).

A review of the PCRA court's opinion discloses it employed the same skewed focus. The court relied on the *Briseno* factors to conclude the absence of intervention by the lay witnesses was a reason to conclude an absence of any deficits. This reliance is

clearly erroneous in light of *Moore*. The ability of lay persons to recognize intellectual disability, let alone know what steps to take to secure a diagnosis for supportive services, is not a part of the professional diagnostic criteria that courts have been directed to employ. The PCRA court's emphasis on Appellant's adaptive capabilities is similarly antithetical to the principles clarified in *Hall*, *Brumsfield*, and *Moore*.

> [T]he medical community focuses the adaptive-functioning inquiry on adaptive *deficits*. *E.g.,* AAIDD–11, at 47 ("significant limitations in conceptual, social, or practical adaptive skills [are] not outweighed by the potential strengths in some adaptive skills"); DSM–5, at 33, 38 (inquiry should focus on "[d]eficits in adaptive functioning"; deficits in only one of the three adaptive-skills domains suffice to show adaptive deficits); *see Brumfield,* 576 U.S., at ——, 135 S.Ct., at 2281 ("[I]ntellectually disabled persons may have 'strengths in social or physical capabilities, strengths in some adaptive skill areas, or strengths in one aspect of an adaptive skill in which they otherwise show an overall limitation.' " (quoting AAMR, Mental Retardation: Definition, Classification, and Systems of Supports 8 (10th ed. 2002))).

*Id.* at 1050 (emphasis in original).

Noting these shortcomings in the PCRA court's analysis, we nevertheless recognize that the court was confronted with competing expert opinions and factual assertions.[17] Under our standard of review, we afford great deference to the court's credibility and factual determinations where there is support in the record. While we conclude the PCRA court made those findings and determinations, in part, on improper considerations, we cannot conclude what credibility and factual determinations the PCRA court would have found, applying a correct *Atkins* analysis. For this reason, our proper

---

[17] We agree with the Commonwealth that our resolution of this case does not require us to opine on the role of the Flynn Effect in the interpretation of IQ test results. We simply note here that the question of whether to consider the Flynn Effect should be informed by the current professional standards. Additionally, the question of *whether* to consider the Flynn Effect is distinct from *how* the effect should be considered.

course is to vacate the order of the PCRA court and remand for its reconsideration of the evidence in the existing record in light of the guidance provided by *Hall*, *Brumfield*, and *Moore*.

## VII. Remaining issues

Appellant argues the PCRA court erred in dismissing his remaining issues without a hearing. The PCRA Court determined Appellant's petition with respect to these issues was untimely. [18]

---

[18]Appellant states these issues as follows:

> 1. Whether the Court committed legal and factual error and abused its discretion in denying Atkins relief where the record evidence demonstrates Appellant is Intellectually Disabled and the death sentence violates the Eighth and Fourteenth Amendments[.]
>
> 2. Whether the Court committed legal and factual error and abused its discretion in dismissing all other claims presented in the PCRA petition without a hearing where Appellant demonstrated that the petition was timely; that he meets a number of exceptions under the PCRA; that he is entitled to relief from his invalid conviction and sentence despite any failure to raise these claims in prior post-conviction proceedings because he was denied his right to effective assistance of post-conviction counsel; and that he is entitled to relief or, in the alternative, an evidentiary hearing[.]
>
> 3. Whether the Court committed legal and factual error and abused its discretion in denying relief, discovery and/or an evidentiary hearing where prior PCRA counsel was ineffective in failing to raise multiple meritorious claims involving the violation of Appellant's rights under 42 Pa. C.S. § 9711 and the Fifth, Sixth, Eighth, and Fourteenth Amendments, including:

Appellant contends two exceptions to the PCRA's jurisdictional time constraints apply.[19]  First, he avers that interference by government officials prevented him from timely raising most of his issues.  To establish this exception, a petitioner must show that

(a)	The Prosecutor's Peremptory Strikes Violated the Sixth, Eighth and Fourteenth Amendments.

(b)	As a Result of Court Error, Counsel's Ineffectiveness and Prosecutorial Misconduct, the Jury Never Heard Evidence Disputing the Prosecution's Case and Supporting the Defense in Violation of the Sixth, Eighth and Fourteenth Amendments.

(c)	Counsel's Failure to Investigate, Develop and Present Available Mitigation Evidence and Effectively Argue the Case for Life Violated the Sixth, Eighth and Fourteenth Amendments.

(d)	The Jury's Consideration of an Invalid Aggravating Factor Violated the Sixth, Eighth and Fourteenth Amendments.

(e)	The Penalty Phase Instructions Violated the Sixth, Eighth and Fourteenth Amendments;

(f)	The cumulative prejudicial effect of the errors requires relief.

Appellant's Brief at 2-3.

[19] Although not argued in the context of meeting the timeliness exceptions to the PCRA, Appellant argues he is entitled to relief pursuant to *Williams v. Pennsylvania*, 136 S. Ct. 1899 (2016), which was issued during the pendency of our remand of this PCRA appeal for a hearing on his *Atkins* claim.  In *Williams* the United States Supreme Court held that former Chief Justice Castille's failure to recuse in an appeal from a case in which he participated as district attorney was a violation of Williams' due process rights.  In his initial brief, Appellant claimed he is entitled to the same remedy.  However, responding to the Commonwealth's counter-arguments, Appellant concedes in his reply brief that this claim is premature.  Appellant's Brief at 1-2 (citing *Commonwealth v. Lark*, 746 A.2d 585, 588 (Pa. 2000) (precluding the filing of new PCRA claims during the pendency of an appeal of a prior PCRA decision)).  Accordingly, we do not consider this issue further.

"the failure to raise the claim previously was the result of interference by government official with the presentation of the claim *in violation of the Constitution or laws of this Commonwealth* or the Constitution or laws of the United States." 42 Pa.C.S. § 9545(b)(1)(i) (emphasis added). Appellant notes that, during his first PCRA, he submitted pro se filings with the PCRA court and with this Court on appeal, identifying several issues PCRA counsel had not raised and requesting new counsel. Appellant argues that these filings demonstrated that he was being denied his constitutional right to effective representation during his PCRA proceedings and appeal. In support, he cites *Commonwealth v. Albrecht*, 720 A.2d, 693, 699 (Pa. 1998) (holding that a rule based right to counsel requires an enforceable right to effective assistance of counsel). Appellant argues the Prothonotary for each court misapprehended his filings and erroneously treated them as hybrid filings, *i.e.*, forwarding them to counsel without docketing them for court action in accordance with *Commonwealth v. Kenny*, 732 A.2d 1161, 1164 (Pa. 1999) (holding remand for appointment of counsel is appropriate remedy when the right to appointment counsel has been effectively denied). Appellant also argues that his cognitive impairments create an extraordinary circumstance warranting relief based on a denial of effective assistance of counsel.[20]

Appellant mischaracterizes the facts and the case law. Appellant's pro se filing with the PCRA court during the pendency of his first PCRA petition did enumerate and argue the merits of ten issues in addition to those contained in his amended PCRA petition prepared by appointed counsel. It did not, as Appellant contends, aver ineffective assistance by his first PCRA counsel or seek appointment of new counsel. *See* Amended

---

[20] The Commonwealth argues all but one of Appellant's remaining issues could have been raised in his first PCRA and are therefore waived. The Commonwealth does not comment on the timeliness of Appellant's PCRA petition relative to these issues.

PCRA Petition exhibit 1 ("Addendum of Alleged Errors in Support of Counsel's Amended PCRA Ineffective Counsel Inter Alia").[21] On appeal from the dismissal, Appellant filed a second pro se filing with this Court. *See Id.* exhibit 2 ("Petition for PCRA Counsel's Withdrawal Contingent Upon & Conformity With Defendant's Ineffective Assistance of PCRA Counsel Claims. And For the Appointment of New Counsel by the Above Court"). Therein, Appellant again enumerated the issues he wished to pursue and faulted PCRA counsel as ineffective for failing to do so. However, Appellant did not file his pro se motion until July 28, 2004, 14 months after the filing of his counseled appellate brief and seven months after the Commonwealth filed its appellee's brief. In accordance with the Rules pertaining to hybrid pro se filings, the Prothonotary forwarded the document to Appellant's counsel without entering it in to the docket.[22] As this Court has explained, appellate counsel's issue selection cannot be determined to be ineffective prior to a resolution of the issues advanced. "[I]n this context, there can be no claim of ineffective assistance, and counsel need not be called upon to articulate a reasonable basis for not including the foregone claims." *Commonwealth v. Jette*, 23 A.3d 1032, 1042 (Pa. 2011).

---

[21] Appellant, in his final paragraph of the referenced addendum, did "reserve" the right to further amend his petition and seek substitute counsel, but there is no evidence such subsequent request was filed with the PCRA court.

[22] Rule 3304 provides as follows:

### Rule 3304. Hybrid Representation

Where a litigant is represented by an attorney before the Court and the litigant submits for filing a petition, motion, brief or any other type of pleading in the matter, it shall not be docketed but forwarded to counsel of record.

Pa.R.A.P. 3304.

Furthermore, the cases upon which Appellant relies did not involve hybrid representation. In *Albrecht*, after alleging his appointed PCRA counsel's ineffectiveness, Albrecht obtained new counsel to appeal the denial of his PCRA petition. On appeal, his new counsel argued PCRA counsel was ineffective for failing to brief certain issues raised in the PCRA petition, resulting in waiver. Instantly, Appellant did not allege PCRA counsel's ineffectiveness before the PCRA court, and only presented his claims of PCRA counsel's ineffectiveness before this Court through a hybrid filing. Appellant's reliance on *Kenney* is also misplaced. The process prescribed therein for appointment of new PCRA counsel concerned instances where a PCRA petitioner's right to appeal had been completely foreclosed by existing counsel's action or inaction.

> An indigent petitioner has the right to appointment of counsel to assist in prosecuting a first PCRA petition. Pa.R.Crim.P. 1504(a). Where that right has been effectively denied by the action of court or counsel, the petitioner is entitled to a remand to the PCRA court for appointment of counsel to prosecute the PCRA petition.

*Kenney*, 732 A.2d at 1164 (citations omitted). Instantly, Appellant's right to appeal was not impaired. Rather, he takes issue with counsel's issue selection.[23] He has not shown that the action of the Prothonotary in forwarding his petition to counsel in accordance with Rule 3304 was illegal. Thus, we reject Appellant's contention that government interference prevented him from timely raising his ineffective assistance of counsel issues.[24]

---

[23] Appellant did not assert a right to self-representation. In any event, such a request must be made before the filing of a counseled appellate brief. *See Commonwealth v. Rogers*, 645 A.2d 223, 224 (Pa. 1994) (holding a defendant has a right to proceed pro se, but a request to change status is untimely if initiated after a counseled brief has been filed on his or her behalf).

[24] In his hybrid pro se petition, Appellant identified 31 issues that he claimed PCRA counsel failed to pursue. Appellant does not attempt to correlate those issues with the

Appellant also claims two of his issues, i.e., issues 3(a) and 3(b), fall under the newly discovered fact exception of Section 9545(b)(1)(ii).

> [S]ubsection (b)(1)(ii) has two components, which must be alleged and proved. Namely, the petitioner must establish that: 1) "the *facts* upon which the claim was predicated were *unknown*" and (2) could not have been ascertained by the exercise of *due diligence.*" 42 Pa.C.S. § 9545(b)(1)(ii)(emphasis added). If the petitioner alleges and proves these two components, then the PCRA court has jurisdiction over the claim under this subsection.

*Commonwealth v. Burton*, 158 A.3d 618, 628 (Pa. 2017).

> Additionally, any petition filed pursuant to any of these timeliness exceptions must be filed within 60 days of when the petition could have been presented. [T]he 60–day rule requires a petitioner to plead and prove that the information on which he relies could not have been obtained earlier, despite the exercise of due diligence.

*Commonwealth v. Albrecht*, 994 A.2d 1091, 1094 (Pa. 2010) (internal citations and quotation marks omitted).

Appellant does not specifically identify the previously unknown facts in his discussion of the timeliness exception. Based on his discussion of the merits he apparently alludes to certain information the Commonwealth allegedly failed to disclose at the time of trial.[25] However, Appellant does not state when he first learned of these facts or explain how he was prevented from discovering them earlier with due diligence.

---

issues stated in his current PCRA petition that he now claims he was prevented from raising in a timely PCRA petition.

[25] These include a purported witness statement placing Appellant with her at the time the killings occurred, and the publication of a report identifying certain racially targeted voir dire training and practices by the Philadelphia District Attorney's Office. Appellant's Brief at 37, 43.

Accordingly, Appellant has failed to meet his burden to show he qualifies for any of the exceptions to the jurisdictional timeliness constraints of the PCRA relative to his remaining issues. *See Id.*

## VI. Conclusion

In summation, we conclude the PCRA court's evaluation of the evidence in this case erroneously incorporated invalid and irrelevant considerations, tainting its conclusion. Specifically, the PCRA court misplaced its focus on Appellant's adaptive strengths as negating the evidence of his adaptive deficits. The PCRA court also departed from the holding in *Moore* in its consideration of the 1987 WAIS-R test score, by disregarding the SEM due to "other sources of imprecision." *Moore,* 137 S. Ct. at 1049. Additionally, the PCRA court's reliance on the *Briseno* factors, while informed by this Court's prior cases is erroneous in light of *Moore*. Because conflicts remain in the testimony, we remand to the PCRA court to reconsider the existing record in this case in accordance with this opinion. Finally, we deem Appellant's remaining issues untimely, and affirm the PCRA court's dismissal of that portion of the PCRA petition.

Justices Donohue, Dougherty and Wecht join the opinion.

Chief Justice Saylor and Justices Baer and Todd did not participate in the consideration or decision in this case.