[J-120-2019] [MO: Mundy, J.]

# IN THE SUPREME COURT OF PENNSYLVANIA
## EASTERN DISTRICT

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 771 CAP |
| | : | |
| Appellee | : | Appeal from the Order dated |
| | : | November 21, 2018 (docketed |
| | : | November 26, 2018) in the Court of |
| v. | : | Common Pleas, Bucks County, |
| | : | Criminal Division at No. CP-09-CR- |
| | : | 0006917-2005. |
| ROBERT ANTHONY FLOR, | : | |
| | : | SUBMITTED: December 19, 2019 |
| Appellant | : | |

## DISSENTING OPINION

**JUSTICE WECHT**                                    **DECIDED: September 22, 2021**

In 2006, Robert Anthony Flor pleaded guilty to first-degree murder. A jury sentenced him to death. Flor filed a timely petition pursuant to the Post Conviction Relief Act.[1] Flor claimed, *inter alia*, that he was ineligible for the death penalty pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002), and its progeny because he is intellectually disabled.[2] The PCRA court rejected Flor's claim and denied relief. Today's learned Majority affirms.

Upon review of the extensive record in this capital case, I am constrained to disagree. Flor has established that he is intellectually disabled. He is now constitutionally ineligible for the death penalty. The record does not support the PCRA court's findings

---

[1]     42 Pa.C.S. § 9541-9546.

[2]     At the time that *Atkins* was decided, the prevailing terminology in the medical, professional, and legal community was "mental retardation." *Atkins,* 536 U.S. at 317. However, since that time, the term has been replaced with "intellectual disability." *See Hall v. Florida*, 572 U.S. 701, 704 (2014); *Commonwealth v. Cox*, 240 A.3d 509, 510 n.2 (Pa. 2020) (*Cox IV*); *Commonwealth v. Thomas*, 215 A.3d 36, 44 n.10 (Pa. 2019).

to the contrary. In rejecting Flor's evidence, the PCRA court made a number of legal errors that are contrary to the record and to the governing law as propounded in *Atkins* and its progeny. Those legal missteps prevent me from joining the Majority's affirmance of the PCRA court's order. Hence, this dissent.

## I. *Atkins* - Merits

The Eighth Amendment to the United States Constitution bars the infliction of "cruel and unusual punishments." In *Atkins*, the Supreme Court of the United States held that, consistent with our society's evolving standards of decency, executing intellectually disabled offenders constitutes a cruel and unusual punishment and, therefore, is barred by the Eighth Amendment.[3] Since *Atkins*, numerous decisions have identified and refined the manner in which courts assess whether an offender is intellectually disabled.[4]

In *Hall v. Florida*, the Supreme Court held that an *Atkins* determination must be "informed by the medical community's diagnostic framework."[5] Relying upon manuals from the American Psychiatric Association (APA) and the American Association on Intellectual and Developmental Disabilities (AAIDD), *Moore-I* held that current manuals reflect improved understanding over time, and offer "the best available description of how mental disorders are expressed and can be recognized by trained clinicians."[6]

---

[3]     *Atkins*, 536 U.S. at 321.

[4]     *See generally Cox IV*, 240 A.3d 509.

[5]     572 U.S. 701, 703 (2014); *see also Moore v. Texas*, 137 S.Ct. 1039, 1053 (2017) (*Moore-I*) (providing that the "medical community's current standards" guide *Atkins* determinations).

[6]     *Moore-I*, 137 S.Ct. at 1053. *Moore-I* relied specifically upon the 11th edition of the AAIDD clinical manual (the AAIDD, Intellectual Disability: Definition, Classification, and Systems of Supports (2010) (hereinafter AAIDD-2010)), and upon the 5th edition of the Diagnostic and Statistical Manual of Mental Disorders published by the APA (the Diagnostic and Statistical Manual of Mental Disorders (2013) (hereinafter DSM-5)).

The APA's DSM-5 and the AAIDD-2010 were the most recent diagnostic manuals available to the post-conviction court in this case. Based upon the diagnostic criteria recognized by the APA and the AAIDD, this Court has held that an intellectual disability diagnosis results from three findings: (1) deficits in intellectual functioning as measured by intelligence quotient testing; (2) deficits in adaptive functioning; and (3) the onset of these deficits before the age of eighteen.[7]

Intellectual functioning is defined numerically by an intelligence quotient (IQ). Generally, scores of seventy-five and below fall within the presumptive range of intellectual disability.[8] Under current diagnostic guidelines, both the APA and the AAIDD have rejected rigid IQ cutoffs, instead favoring testing and clinical assessment.[9] When courts in Florida relied too heavily upon IQ scores to establish or refute intellectual disability, the Supreme Court of the United States stepped in, holding that such overreliance was an impermissible deviation from the most recent governing diagnostic standards.[10] When courts in Texas deviated from the APA's and AAIDD's diagnostic standards by relying upon that state's "*Briseno*" factors in assessing the adaptive deficits prong,[11] the Supreme Court rejected these deviations.[12] Consistent with these High Court directives, this Court has recognized that the "chief import of [*Hall*, *Brumfield* and *Moore-*

---

[7]     *Commonwealth v. Miller*, 888 A.2d 624, 631 (Pa. 2005).

[8]     Def. Ex. 24, DSM-5, at 37; *Brumfield v. Cain*, 576 U.S. 305, 315 (2015); *Commonwealth v. Williams*, 61 A.3d 979, 983 (Pa. 2013).

[9]     Def. Ex. 24, DSM-5, at 33, 37; Def. Ex. 28, AAIDD-2012, at 23.

[10]    *Hall*, 572 U.S. at 701; *see also Brumfield*, 576 U.S. at 314 ("[A]n IQ test result cannot be assessed in a vacuum.").

[11]    *See Ex parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004).

[12]    *Moore-I*, 137 S.Ct. at 1051-52.

*I*] is the central role of the societal consensus to rely on medical and professional expertise in defining and diagnosing intellectual disability."[13]

At the hearing on Flor's post-conviction petition, Flor presented five mental health experts: Drs. Martell, Voskanian, Mack, Tepper, and Dougherty.  Each testified that Flor is intellectually disabled under current diagnostic standards.  Two of these experts, Dr. Mack and Dr. Voskanian, testified at Flor's penalty phase in 2006, but, at that time, did not assess Flor specifically for the purpose of ascertaining whether he was intellectually disabled.  However, Dr. Tepper testified at the penalty phase in 2006 that Flor was not intellectually disabled.  In post-conviction proceedings, Drs. Mack, Voskanian, and Tepper (reversing his earlier conclusion), reviewed additional information about Flor, considered this information in accord with current diagnostic criteria, and diagnosed Flor with intellectual disability.

Dr. Mack administered an IQ test to Flor in 2006 that resulted in a score of seventy-six, which, Dr. Mack testified, had to be lowered by three points to account for the Flynn Effect.[14]  The Flynn Effect measures the drift of test scores in the population from the date the test was normed and reflects a finding that the average IQ score of the population increases at a rate of three points each decade, causing IQ scores to inflate at the same rate.[15]  To correct for this norm obsolescence, the AAIDD advises that any IQ score

---

[13]     *Commonwealth v. Cox*, 204 A.3d 371, 387 (Pa. 2019) (*Cox III*).

[14]     Notes of Testimony ("N.T."), 10/18/2013, at 46-50, 54-78, 150-51, 209-13.

[15]     *Cox IV*, 240 A.3d at 522 n.23 ("The DSM-IV identifies the Flynn Effect as one possible factor that may affect the validity of a particular IQ assessment score. The effect refers generally to the production of overly high IQ scores that result from comparing current test results to out of date norms.") (citing *Cox III*, 204 A.3d at 385 and DSM-IV at 37); *see also* Maj. Op. at 18, n.14.

should be reduced by 0.3 points each year since the test was normed.[16] The APA likewise recognizes the Flynn Effect.[17] Like Dr. Mack, Flor's other experts testified that IQ scores should take into account and be corrected for this norm obsolescence. Flor's IQ was tested in 2006 using the Wechsler Adult Intelligence Scale-III, a test that was normed ten years earlier. Accounting for the Flynn Effect, Flor's 2006 IQ score would be reduced from seventy-six to seventy-three, within the presumptive range for intellectual disability.

Dr. Mack testified that Flor is intellectually disabled.[18] Dr. Mack attributed his diagnosis to new information, including learning that Flor falsely had reported in 2006 that he had obtained his GED at age nineteen,[19] and learning that Dr. Davies had diagnosed Flor with fetal alcohol syndrome (FAS), a risk factor for intellectual disability. Similarly, Dr. Tepper reconsidered evidence of Flor's intellectual disability in connection with the post-conviction proceedings with the aid of updated evidence regarding Flor's adaptive functioning and deficits before the age of eighteen. Dr. Tepper testified that he now believes Flor to be intellectually disabled.[20] According to Dr. Tepper, Flor was born with FAS, which may demonstrate the etiology of Flor's intellectual disability.[21] Dr. Voskanian also testified that he believes Flor to be intellectually disabled based upon new

---

[16]    *See* Def. Ex. 27, AAIDD-2010, at 37 ("[B]est practices require recognition of a potential Flynn Effect when older editions of an intelligence test (with corresponding older norms) are used in the assessment or interpretation of an IQ score.").

[17]    Def. Ex. 24, DSM-5, at 37 ("Factors that may affect [IQ] test scores include practice effects and the 'Flynn Effect' (*i.e.*, overly high scores due to out-of-date test norms).").

[18]    N.T., 10/18/2013, at 183.

[19]    *Id.* at 202.

[20]    N.T., 7/9/2015, at 49-50, 56-59.

[21]    *Id.* at 52.

information, including lay witness declarations and recent reports by Drs. Patton, Davies, Novick-Brown, and Greenspan.[22]

In addition, Flor presented the testimony of Edward Dougherty, Ed.D., a psychologist who conducted a screening assessment of Flor in March 2006 and identified indicia of FAS and cognitive and intellectual impairments. In 2013, Dr. Dougherty reviewed additional information regarding Flor's background and adaptive functioning, Dr. Mack's testing, and Dr. Davies' FAS assessment, and diagnosed Flor with intellectual disability.[23]

Daniel Martell, Ph.D., a neuropsychologist, diagnosed Flor with intellectual disability, assessed Flor's adaptive deficits, and critiqued the Commonwealth's expert. Alan Kaufman, Ph.D., a psychologist, assessed Flor's deficits in intellectual functioning and found that this prong of intellectual disability was satisfied. James Patton, Ed.D., an expert in intellectual disability, and Natalie Novick-Brown, Ph.D., a psychologist, assessed Flor's adaptive functioning prior to the age of eighteen and found that this prong was satisfied.

Additionally, Flor presented other experts who testified that they had diagnosed him with FAS, which assisted in establishing the age of onset and the origin of Flor's intellectual disability. Julian Davies, M.D., a FAS diagnostic specialist, found in 2012 that Flor suffered from FAS. Dr. Novick-Brown, who specializes in fetal alcohol spectrum disorder (FASD), also concluded that Flor suffered from FAS.

Neuropsychologist Bernice Marcopulos, Ph.D., evaluated Flor for the Commonwealth. Dr. Marcopulos conceded that Flor demonstrated deficits in intellectual

---

22     N.T., 5/29/2014, at 119-30.

23     N.T., 10/18/2013, at 39-71.

functioning. Although Dr. Marcopulos disagreed with the impact of the Flynn Effect upon Flor's IQ score, she agreed that Flor's score of seventy-six satisfied the first prong, as current standards do not impose a rigid cut-off. [24] Accordingly, this prong was not in dispute before the PCRA court. Dr. Marcopulos did not believe, however, that the remaining two prongs of intellectual disability were satisfied.

The adaptive functioning criterion is met when deficits are present in at least one of three domains: conceptual, social, or practical.[25] With respect to the conceptual domain, Dr. Mack administered a neuropsychological battery to Flor in 2006 and concluded that Flor's impairments included deficits in executive functioning, memory, attention, verbal fluency, word finding, arithmetic, reading comprehension, spelling, and constructional dyspraxia.[26] Dr. Marcopulos, testifying for the Commonwealth, agreed with the manner in which Dr. Mack administered, scored, and interpreted the testing, and agreed with his conclusion.[27] This testing established deficits in the conceptual domain. Dr. Marcopulos declined to diagnose Flor with intellectual disability, even though only one adaptive functioning criterion needs to be established.

Turning to academic functioning, which also pertains to the conceptual domain, the evidence of Flor's education history demonstrates that he began to do poorly academically in middle school and ultimately dropped out of school in the eleventh grade. Flor's decline was reflected in standardized testing. Flor's experts also found deficits in

---

[24]    N.T., 2/16/17, at 110-11.

[25]    Def. Ex. 24, DSM-5, at 37; Def. Ex. 32, AAIDD-2010, at 43.

[26]    N.T., 11/13/2006, at 144-71; N.T., 11/14/2006, at 8-16; N.T., 2/16/2017, at 131-56.

[27]    N.T., 12/2/2016, at 50-53, 59-61; N.T., 2/16/2017, at 143-44.

executive functioning, self-direction, and concept formation, and found that Flor exhibited deficits in communication before and into adulthood.[28]

With respect to the social domain, the record demonstrates that Flor began experiencing deficits in interpersonal relationships as a child, and that those difficulties continued throughout his life.[29] In addition, Flor was emotionally unstable during childhood and had a similar history of emotional dysregulation as an adult.[30] Relevant to the practical domain, before the age of eighteen, Flor demonstrated poor financial skills, had difficulty with potty-training, required assistance with hygiene and dressing, and engaged in risky behavior.[31] After the age of eighteen, Flor was able to complete only simple tasks and struggled with obtaining and keeping employment.[32] Throughout his life, Flor exhibited impaired functioning and judgment.[33]

Flor also presented evidence demonstrating that his deficits were present before the age of eighteen and were correlated to brain damage caused by FAS.[34] The AAIDD has identified risk factors that can be associated with a diagnosis of intellectual

---

[28] N.T., 2/8/2018, at 61, 74-77, 85-86; *see also* N.T., 2/17/2017, at 45, 89-90 (Dr. Marcopulos).

[29] N.T., 1/22/2015, at 84-85; N.T., 2/17/2017, at 42-55; Def. Ex. 62, Interviews, at 34-40; N.T., 2/8/2018, at 92-95.

[30] N.T., 11/13/2016, at 90-91; N.T., 11/14/2016, at 111-12; Def. Ex. 8, Interviews, at 4; N.T., 12/2/2016, at 156; N.T., 2/8/2018, at 98-100.

[31] N.T., 2/8/2018, at 102-06; Def. Ex. 62, Interviews, at 44-48.

[32] N.T., 2/17/2017, at 132-37, 140-41, 148-51; N.T., 2/8/2018, at 105, 132-37; Def. Ex. 31, Interview; Def. Ex. 62, Interviews, at 52-55.

[33] N.T., 2/17/2017, at 137, 148-50, 150-51.

[34] N.T., 1/22/2015, at 37-38.

disability,[35] one of which is FAS. Flor proved that he suffered from FAS, which is the most severe diagnosis on the fetal alcohol disorder spectrum.[36] Dr. Davies, a fetal alcohol diagnostician, evaluated Flor and diagnosed Flor with FAS based upon three factors: growth deficiency, brain dysfunction, and a cluster of three facial features unique to FAS.[37] Psychologist Natalie Novick-Brown, Ph.D., performed a functional assessment and determined that Flor's impairments were consistent with, and could be explained by, FAS.[38] Flor also presented evidence documenting a family history of abuse and a history of head injuries, both of which are risk factors associated with intellectual disability.[39]

The PCRA court found that Flor's experts were not credible. Flor argues, persuasively in my judgment, that, in doing so, the PCRA court erroneously disregarded the current diagnostic standards, employed the *Briseno* factors contrary to United States Supreme Court precedent, and relied upon misperceptions of a kind specifically invalidated by this Court and by the U.S. Supreme Court. Flor further asserts–again, persuasively–that the PCRA court also made conclusions that are not supported by the record.

For example, the PCRA Court found no credible evidence of intellectual deficits in the record.[40] Yet, there was unanimity among all of the experts, including the Commonwealth's expert, that the evidence established Flor's deficient intellectual

---

[35]     Def. Ex. 59, AAIDD-2010, at 57-62, 68.

[36]     N.T., 6/26/2014, at 134-37; N.T., 1/22/2015, at 37-38, 54-55; Def. Ex. 1, at 188.

[37]     N.T., 6/26/2014, at 27-28, 49, 63; Def. Ex. 1, at 188.

[38]     N.T., 1/22/2015, at 34, 44-100.

[39]     N.T., 11/13/2006, at 7, 48, 55-56, 62, 74; N.T., 2/8/2018, at 37-40, 207-08; N.T., 5/9/2018, at 204-06; Def. Ex. 1, at 192; Def. Ex. 6, at 30-31; Def. Ex. 59, at 60; Def. Ex. 62, at 10-11.

[40]     PCRA Ct. Op. at 62, 72, 121, 127-32.

functioning. As Commonwealth witness Dr. Marcopulos testified, the greater flexibility that is now prevalent with respect to IQ scores stems from the AAIDD's and APA's current diagnostic standards, standards that our courts are bound to consider.[41] The PCRA court had no authority to disregard diagnostic standards, applicable precedent, or unanimity among the experts. Accordingly, the PCRA court's finding that Flor failed to establish the intellectual functioning prong of intellectual disability violates *Atkins* and its progeny, and entirely disregards the uncontradicted evidence of record.

The Majority's affirmance of the PCRA court's disregard of this evidence, and its characterization of Flor's 2006 IQ score as encompassing "a range of uncertainty," compound this error.[42] Although there was some dispute about the impact of the Flynn Effect upon Flor's 2006 IQ score, Dr. Marcopulos agreed with defense evidence that Flor satisfied the first prong of intellectual disability.[43] The record demonstrates unanimity

---

[41]     *Brumfield*, 576 U.S. at 315; *Hall*, 572 U.S. at 710-11.

[42]     *See* Maj. Op. at 48.

[43]     The Majority agrees that a strict IQ cut-off is not warranted under current diagnostic standards. *See* Maj. Op. at 27; *Hall*, 572 U.S. at 712–13. As the High Court has explained:

> The professionals who design, administer, and interpret IQ tests have agreed, for years now, that IQ test scores should be read not as a single fixed number but as a range. Each IQ test has a "standard error of measurement," often referred to by the abbreviation "SEM." A test's SEM is a statistical fact, a reflection of the inherent imprecision of the test itself. An individual's IQ test score on any given exam may fluctuate for a variety of reasons. . . .

> The SEM reflects the reality that an individual's intellectual functioning cannot be reduced to a single numerical score. For purposes of most IQ tests, the SEM means that an individual's score is best understood as a range of scores on either side of the recorded score. The SEM allows clinicians to calculate a range within which one may say an individual's true IQ score lies.

among all of the experts who opined upon the first prong of an intellectual disability diagnosis that Flor demonstrated deficits in intellectual functioning as measured by intelligence quotient testing. The lower court had no basis upon which to discredit this unanimous finding.

It appears that the PCRA court's reticence to accept evidence of Flor's intellectual deficits was rooted in its skepticism of the Flynn Effect. Although the PCRA Court did not reject the validity of the Flynn Effect outright, it cited with approval testimony from a Commonwealth witness, Leigh Hagan, Ph.D.. Dr. Hagan testified that the Flynn Effect should be considered in evaluating IQ scores, but that IQ scores should not necessarily be corrected to account for the Flynn Effect.[44]

Although this Court has not yet spoken to the role of the Flynn Effect in *Atkins* proceedings, we have made clear that *Atkins* assessments must be "informed by the current professional standards."[45] The AAIDD and the APA acknowledge the role of the Flynn Effect either directly or indirectly by requiring that test scores be interpreted along with clinical judgment.[46] To the extent that current diagnostic standards recognize that the Flynn effect at least has some impact upon IQ scores, it should not have been entirely

---

*Id.* at 713.

[44]     N.T., 5/23/2017, at 133-34, 141-42; PCRA Ct. Op. at 126-28.

[45]     *Cox*, 204 A.3d at 388 n.17 (agreeing with the Commonwealth that "our resolution of this case does not require us to opine on the role of the Flynn Effect in the interpretation of IQ test results. We simply note here that the question of whether to consider the Flynn Effect should be informed by the current professional standards").

[46]     Def. Ex. 27, AAIDD-2010, at 37 ("best practices require recognition of a potential Flynn Effect when older editions of an intelligence test (with corresponding older norms) are used in the assessment or interpretation of an IQ score"); Def. Ex. 24, DSM-5, at 37 ("Factors that may affect [IQ] test scores include practice effects and the 'Flynn Effect' (*i.e.*, overly high scores due to out-of-date test norms)."). These authorities call into question the Majority's holding and the Commonwealth's argument that no authority mandates correcting for the Flynn effect. Maj. Op. at 20 n.15; 44.

ignored by the PCRA court.  Moreover, the Commonwealth's own witness conceded that Flor had established the intellectual deficits prong even without accounting for the Flynn Effect.  There was no record support that allowed the PCRA court to reject the unanimous opinions of the experts with regard to this prong.  The role of the Flynn Effect may be an interesting, and perhaps controversial, question in *Atkins* proceedings, but it was not determinative of the intellectual deficits prong in this case.

The Majority elevates the role of the Flynn Effect in this case in order to dismiss it.[47]  Although I disagree that the Flynn Effect was determinative of the first prong of intellectual disability, I am also skeptical of the Majority's assertion that there is a lack of consensus regarding the precise measure of the effect.[48]  It is worth nothing that when James Flynn, after whom the effect is named, published his study of the Flynn Effect in 1984, "he derived a 'very rough estimate of the rate of IQ gains prevalent in America since 1932, an estimate that suggested an overall rate of at least 0.30 points per year.'"[49]  From this initial study to his more recent scholarship, Flynn has continued to support his theory "that the full-scale IQ scores of the American population have increased at an average rate of 0.3 points per year or three points per decade."[50]

---

[47]    Maj. Op. at 43-44.

[48]    *See id.* at 43.

[49]    Geraldine W. Young, *A More Intelligent and Just Atkins: Adjusting for the Flynn Effect in Capital Determinations of Mental Retardation of Intellectual Disability,* 65 VAND. L. REV. 615, 624 (2012) (citing James R. Flynn, *The Mean IQ of Americans: Massive Gains 1932 to 1978,* 95 PSYCHOL. BULL. 29, 34 (1984)).

[50]    *Id.* at 625 (citing James R. Flynn, *What Is Intelligence? Beyond the Flynn Effect,* 112-14 (Cambridge University Press 2007) (explaining that, for every year that passes from when an IQ test was standardized, "obsolescence has inflated their IQs by 0.30 points")); *id.* at 622 (citing Ulric Neisser, *The Rising Curve: Long-Term Gains in IQ and Related Measures,* 5, 12 (APA 1998) (discussing that, although Wechsler studied test scores of people and discovered a three-point gain per decade, it was Flynn who first

The importance that the AAIDD places upon the Flynn Effect in assessing the first prong of intellectual disability counsels against the Majority's rejection of a downward adjustment of a subject's score.[51] The AAIDD notes that a WAIS-III test normed in 1995 with a mean of 100 would have a mean of 103 in 2005, ten years later.[52] The WAIS-IV manual itself accounts for the Flynn Effect, reflecting an increase of about .3 points for every year between the release of two different versions of the WAIS test.[53] Recognition of the Flynn Effect is necessary for reliability, particularly when conducting retrospective diagnoses where "the individual with [intellectual disability] did not receive an official diagnosis . . . during the developmental period."[54] Of course, the most current norms of an intelligence test should be used at all times. But for retrospective diagnoses where this is not possible, the AAIDD indicates that, where a test with aging norms is used, a correction for the age of the norms is warranted.[55] Disregarding the consensus that has

---

systematically documented the size and significance of these IQ gains; and explaining that the Flynn Effect of three points per decade has been a "steady and systematic" gain)).

[51] *See* Maj. Op. at 44, n.24.

[52] John H. Blume, Sheri Lynn Johnson, and Christopher Seeds, *Of Atkins and Men: Deviations from Clinical Definitions of Mental Retardation in Death Penalty Cases*, 18 CORNELL J.L. & PUB. POL'Y 689, 701 (2009) (citing AAIDD, User's Guide: Mental Retardation Definition, Classification and Systems of Supports 21 (10th ed. 2007)).

[53] *Cox III*, 204 A.3d at 380 ("The WAIS-IV manual contains data for this effect between the -III and the current -IV versions reflecting an increase of about .3 point per year.").

[54] *Id.*

[55] John Matthew Fabian, William W. Thompson, IV, Jeffrey B. Lazarus, *Life, Death, and IQ: It's Much More than Just a Score: Understanding and Utilizing Forensic Psychological and Neurospychological Evaluations in Atkins Intellectual Disability/Mental Retardation Cases*, 59 CLEV. ST. L. REV. 399, 416 (2011) (relying upon the AAIDD Ad Hoc Committee on Terminology and Classification, Intellectual Disability: Definition, Classification and Systems of Supports 37 (11th ed. 2010)).

emerged to account for the Flynn Effect is unacceptable under *Atkins* jurisprudence because it creates "an unacceptable risk that persons with intellectual disability will be executed."[56] I cannot join the Majority's view of the record as supporting the PCRA court's rejection of the Flynn Effect as having no bearing upon Flor's IQ test result.

The PCRA court, and now the Majority, place more weight on Dr. Mack's 2006 testimony that Flor's IQ scores possibly could have been suppressed than that testimony can support.[57] In November 2006, Dr. Mack identified Flor's low IQ score, academic impairments, and cognitive impairments, but had no clear idea as to the cause of Flor's brain damage and intellectual impairment. At that time, Flor's false assertion that he had obtained his GED demonstrated a higher level of intellectual functioning than was consistent with the other evidence Dr. Mack observed. Based upon this false assertion and Flor's relatively higher results on vocabulary subtests, Dr. Mack concluded that Flor had a higher level of cognitive functioning earlier in his life and that the later decline was due to the combination of alcohol use and head trauma. Learning that Flor had not obtained his GED, together with other new evidence, caused Dr. Mack to reevaluate his 2006 opinion. Dr. Mack's reconsideration of his prior opinion is consistent with the requirement that a diagnosis of intellectual disability is to be informed by current diagnostic standards rather than standards employed in the past.[58]

---

The authority upon which the Majority relies to dispute my contention that the Flynn Effect advises a downward adjustment of a subject's score supports my position. Maj. Op. at 44, n.24. In *Coleman v. State*, 341 S.W.3d 221, 242 n.55 (Tenn. 2011), the Supreme Court of Tennessee relied upon the AAIDD to hold that "the most current versions of a test should be used at all times and, when older versions of the test are used, the scores must be correspondingly adjusted downward."

[56]     *Hall*, 572 U.S. at 704; *see also Moore-I*, 137 S.Ct. at 1044.

[57]     Maj. Op at 39, 43, 45.

[58]     *Moore-I,* 137 S.Ct. at 1053; *Cox III*, 204 A.3d at 388 n.17.

Flor further argues, and I agree, that the PCRA court's analysis of adaptive deficits likewise was based upon legal error and is not supported by the record. The PCRA court credited the testimony of Dr. Marcopulos, who opined that Flor could not establish the second prong of intellectual disability because he operated heavy machinery as an adult, ran his own carpeting business, was able to converse with his mother by phone, played with friends as a child, bought and prepared food, paid bills, wrote letters, filed a grievance in prison, filed *pro se* materials with the court, and was not described as intellectually disabled by several individuals with whom Dr. Marcopulos spoke.[59] The PCRA court's focus misses the mark entirely. In fact, to rest an adaptive deficits conclusion solely upon the subject's adaptive strengths, rather than deficits, or even to weigh the strengths against the deficits, is to work a patent violation of the current state of the law of *Atkins*-claims review.[60] By focusing upon what Flor could do, rather than on what Flor could not do, the PCRA court ran afoul of current medical standards and, therefore, of *Atkins* and its progeny.[61]

The PCRA court's analysis mirrors that of the lower court in *Moore-I*, which also focused for this prong upon Moore's adaptive strengths, instead of upon his adaptive deficits.[62] Like the PCRA court here, the lower court in *Moore-I* believed that the petitioner's adaptive strengths overcame evidence of his adaptive deficits.[63] However,

---

[59]  PCRA Ct. Op. at 113-125, 128-132.

[60]  *Moore-I*, 137 S.Ct. at 1050; *VanDivner*, 178 A.3d at 117; *Cox* 204 A.3d at 388.

[61]  *See, e.g.*, PCRA Ct. Op. at 59 (rejecting consideration of "only Flor's possible weaknesses . . . without any reference to Flor's achievements in other endeavors").

[62]  *Moore-I*, 137 S.Ct. at 1050 (recognizing that the lower court had recited the strengths it perceived, including that Moore lived on the streets, mowed lawns, and played pool for money).

[63]  *Id.*

the Supreme Court rejected this form of reasoning, observing to the contrary that "the medical community focuses the adaptive-functioning inquiry on adaptive *deficits*."[64]

The Majority construes the PCRA court's consideration of adaptive strengths not as offsetting scientific conclusions about Flor's adaptive deficits, but as illustrating that the experts failed to consider all available information in forming their opinions.[65] The focus of the adaptive-functioning inquiry is upon adaptive deficits, as *Moore-I* directs. The experts' failure to consider adaptive strengths in assessing these deficits cannot, as the Majority holds, undermine credibility as to whether there are adaptive deficits in the first place. Strengths and deficits exist in every person simultaneously, even those who are intellectually disabled. In accord with current diagnostic criteria, a diagnosis of intellectual disability is firmly rooted in deficits, not in strengths or a balancing of strengths against deficits.[66]

Further, Flor aptly demonstrates that courts cannot rely upon commonly held stereotypes relating to individuals with intellectual disabilities. The AAIDD has identified several such stereotypes. These include the belief that intellectually disabled individuals "look and talk differently from persons in the general population," "are completely incompetent and dangerous," "cannot do complex tasks," "cannot get driver's licenses, buy cars, or drive cars," "do not (and cannot) support their families," "cannot romantically

---

[64]     *Id.* (citing AAIDD-11, at 47 ("significant limitations in conceptual, social, or practical adaptive skills [are] not outweighed by the potential strengths in some adaptive skills")); DSM-5, at 33, 38 (inquiry should focus upon "[d]eficits in adaptive functioning;" deficits in only one of the three adaptive-skills domains suffice to show adaptive deficits)); *see also Brumfield*, 576 U.S. at 320 ("[I]ntellectually disabled persons may have 'strengths in social or physical capabilities, strengths in some adaptive skill areas, or strengths in one aspect of an adaptive skill in which they otherwise show an overall limitation.'").

[65]     Maj. Op. at 48.

[66]     *Cox III*, 204 A.3d at 388; *VanDivner*, 178 A.3d at 117.

love or be romantically loved," "cannot acquire vocational and social skills necessary for independent living," and "are characterized only by limitations and do not have strengths that occur concomitantly with the limitations."[67]  Each of the strengths identified by Dr. Marcopulos, and credited by the PCRA court, fall within the stereotypes that the intellectually disabled are "completely incompetent" and "are characterized by limitations and do not have strengths that occur concomitantly with the limitations."  Similarly, Texas' *Briseno* factors, which the Supreme Court has already disapproved, include, *inter alia*, consideration of whether others thought of the individual as intellectually disabled during the developmental period, whether the individual could make plans and carry them out, whether the individual's conduct showed leadership, and whether the individual could respond coherently to oral or written questions.[68]  Dr. Marcopulos' testimony, which the PCRA court accepted, that Flor ran his own business, operated machinery, could speak coherently over the phone, could express himself in writing, and was not thought of as intellectually disabled by others, all implicate the *Briseno* factors, a diagnostic assessment toolkit that was soundly rejected by the Supreme Court in *Moore-I*.

Current medical standards provide that analyzing the second prong of intellectual disability requires individual assessments of the conceptual, social, and practical domains.[69]  It only takes one significant deficit in any of the three domains to establish the second prong.[70]  The PCRA court here did not separately consider these three domains, and made no findings as to whether there were deficits in any of them.  The failure to do so contravened the currently applicable diagnostic standards and, therefore,

---

[67]    Def. Ex. 28, AAIDD-2012, at 26; *see also Moore-I*, 137 S.Ct. at 1051-52 (disapproving of the use of stereotypes in *Atkins* proceedings).

[68]    *Moore-I*, 137 S.Ct. at 1046, n.6, 1051-52.

[69]    Def. Ex. 24, DSM-5, at 33, 34, 37; Def. Ex. 32, AAIDD-2010, at 43.

[70]    Def. Ex. 24, DSM-5, at 33, 34, 37; Def. Ex. 32, AAIDD-2010, at 43.

violated *Atkins* and its progeny. Moreover, Dr. Marcopulos agreed with Dr. Mack's testing methodologies and his conclusions. Dr. Mack concluded that Flor exhibited deficits in the conceptual domain. The Commonwealth's agreement with this conclusion established Flor's adaptive deficits.

The PCRA court also relied upon lay-witness opinions that Flor was not intellectually disabled.[71] *Moore-I* rejected precisely this type of reliance for purposes of resolving an *Atkins* claim.[72] Here, the PCRA court elevated lay witness testimony over even the testimony of the Commonwealth expert, Dr. Marcopulos. Similarly, the PCRA court relied upon evidence that Flor had not been diagnosed with intellectual disability as a child, nor placed in special education classes.[73] The absence of a childhood diagnosis once again implicates one of the *Briseno* factors, which were rejected in *Moore-I*.[74] And it is unsupported by the record. Although Flor was not placed in special education classes, he required support in all academic subjects, was placed in remedial classes, failed these remedial classes, and eventually dropped out of school altogether.[75] Whether the school provided special education opportunities to Flor is not the exclusive means of

---

[71] PCRA Ct. Op. at 118-123.

[72] *Moore-I*, 137 S.Ct. at 1052; *Cox*, 204 A.3d at 388 (likewise holding that relying upon "[t]he ability of lay persons to recognize intellectual disability" was clearly erroneous).

[73] PCRA Ct. Op. at 131.

[74] 137 S.Ct. at 1051-52; *see also Cox*, 204 A.3d at 388.

[75] N.T., 10/18/2013, at 59-60; N.T., 1/22/2015, at 54-55; N.T., 7/9/2015, at 57-58; N.T., 9/15/2017, at 222-23; N.T., 2/17/2017, at 27-28, 90-92; N.T., 2/8/2018, at 59-63; N.T., 5/9/2018, at 172-73; Def. Ex. 2, at 335.

determining whether Flor was in need of support in one or more areas in order to meet age-related expectations.[76]

Turning to the age of onset prong, the PCRA court's analysis is not consistent with the requirements of current medical standards and is not supported by the record. The PCRA court's conclusion is tied to Dr. Marcopulos' testimony that, although Flor's present IQ satisfies the first prong, his IQ was higher before the age of eighteen. Dr. Marcopulos explained this decrease by attributing it to head trauma and alcohol use that occurred after Flor turned eighteen.[77] Dr. Marcopulos's conclusion was premised upon Flor's scores on subtests of vocabulary, which were higher than other subtests. Dr. Marcopulos also relied upon group-administered test results that placed Flor above the second percentile.[78]

Flor argues persuasively that Dr. Marcopulos' methodology does not accord with current diagnostic standards. For example, today's medical standards dictate that the full-scale IQ score, rather than any individual subtest, is the operative score for purposes of intellectual disability. Dr. Marcopulos recognized as much.[79] Further, as Dr. Marcopulos conceded, Flor's placement above the bottom second percentile on group-administered testing cannot be used to rule out deficits in intellectual functioning.[80] And

---

[76]     Def. Ex. 24, DSM-5, at 34.

[77]     N.T., 12/2/2016, at 53-55.

[78]     *Id.* at 55, 59-93.

[79]     N.T., 2/17/2017, at 21.

[80]     Def. Ex. 24, DSM-5, at 37 (providing that a group-administered test is generally inaccurate and is inappropriate to determine the presence or absence of intellectual deficits); N.T., 2/16/17, at 177-78, 199-200, 202-03; N.T., 5/10/2018, at 38-39; Commonwealth Ex. 48, at 18-19.

because the head trauma upon which Dr. Marcopulos relied began in Flor's teen years, the injuries were present in the developmental period before the age of eighteen.[81]

The PCRA court also failed to account for various risk factors for intellectual disability. For instance, Dr. Marcopulos acknowledged that Flor's academic performance "was absolutely dismal" after the sixth grade;[82] that Flor grew up in a chaotic environment marked by physical, emotional, and possibly sexual abuse;[83] and that this environment, Flor's substance abuse, and the risk factors associated with the death of Flor's step-father, who had been the only functioning adult in Flor's life, all led to Flor's decline.[84] The PCRA court believed that Flor was brain-damaged, but that all of these risk factors were the cause.[85]

Contrary to the PCRA court's belief, a diagnosis of intellectual disability does not depend upon whether other underlying causes of the disability are ruled out. Quite the opposite. Intellectual disability is a diagnosis premised upon the three prongs demonstrating impaired functioning, regardless of etiology. The existence of environmental factors or traumatic experiences does not negate the possibility of intellectual disability. Indeed, the AAIDD has established several risk factors for intellectual disability, including FAS and environmental factors such as child abuse, domestic violence, dysfunctional parenting, and lack of educational support. All of these

---

[81]    N.T., 11/13/2006, at 7, 48; N.T., 2/8/2018, at 38-40; Def. Ex. 6, at 30; Def. Ex. 62, at 10-11.

[82]    N.T., 2/17/2017, at 27-28.

[83]    N.T., 2/16/2017, at 141; N.T., 2/17/2017, at 26-27.

[84]    N.T., 2/17/2017, at 27-29.

[85]    PCRA Ct. Op. at 80.

can explain the origin of intellectual disability.[86]   The Supreme Court likewise has instructed courts that risk factors do not obviate intellectual disability, but are probative of the diagnosis.[87]

The Commonwealth conceded that Flor has brain damage, and the PCRA court credited the Commonwealth's explanation for this uncontroverted fact.  Dr. Marcopulos's attribution of Flor's academic decline in the sixth grade to the death of Flor's step-father was credited by the PCRA court as an alternative explanation for deficits in the conceptual domain of adaptive functioning that was somehow separate from intellectual disability.  But an impaired ability to cope with stress, such as that resulting from the death of a parental figure, is an adaptive deficit.  Similarly, Flor's substance abuse and head trauma began soon after his step-father's death.  If Flor's deficits could be attributed to stress, substance abuse, and head trauma, then they were present in the developmental period before the age of eighteen.  Therefore, attributing Flor's brain damage to environmental factors would not detract from the intellectual disability assessment. Flor would still be intellectually disabled.  By attempting to rule out intellectual disability through reliance upon other risk factors to counter the case for intellectual disability, the PCRA court and the Majority violate clinical standards.[88]

---

[86]     Def. Ex. 60, AAIDD-2010, at 68.

[87]     *Moore-I*, 137 S.Ct. at 1051 ("Those traumatic experiences, however, count in the medical community as '*risk factors*' *for* intellectual disability." (emphasis in original) (citing AAIDD-2010, at 59-60)).  As the High Court explained: "Clinicians rely on such factors as cause to explore the prospect of intellectual disability further, not to counter the case for a disability determination."  *Id* (citing AAIDD-2010, at 60 ("[A]t least one or more of the risk factors [described in the manual] will be found in every case of" intellectual disability.)).

[88]     *Id.*

Moreover, the PCRA court's rejection of Flor's evidence regarding FAS is wholly unsupported by the record. The PCRA court rejected the testimony of Dr. Davies, who reached the diagnosis of FAS after evaluating Flor in July 2012. As Dr. Davies testified, a diagnosis of FAS is premised upon a three-prong analysis examining facial features that are unique to prenatal alcohol exposure, growth impairments, and neuropsychological impairments.[89] The PCRA court found that Dr. Davies' testimony was not credible at least in part because there had been no FAS diagnosis at sentencing nor any suspicion by trial counsel or defense experts that Flor may have suffered from FAS.[90] The PCRA court also rejected this diagnosis at least in part because it found no evidence that Flor's mother had consumed alcohol during her pregnancy.[91]

Flor's FAS diagnosis was entirely unrebutted at the PCRA hearing. In the absence of any evidence to the contrary, the PCRA court's rejection of this evidence is dubious and unsupportable, as is the Majority's affirmance.[92] In addition, the PCRA court considered the lack of direct proof of maternal alcohol consumption as a super-factor, elevating its importance over the three-prong diagnostic analysis.[93] The PCRA court relied upon the absence of direct evidence of Flor's mother's alcohol consumption during pregnancy to discredit Dr. Davies. But, as Dr. Davies testified, and as the Commonwealth did not refute, prenatal alcohol exposure does not need to be confirmed to support a

---

[89] Def. Ex. 1, at 188; N.T., 6/26/2014, at 27-28, 49, 63.

[90] PCRA Ct. Op. at 79, 89, 109-12.

[91] *Id.* at 78-81.

[92] *See* Maj. Op. at 47-48.

[93] *Id.* at 81 (referring to maternal alcohol consumption during pregnancy as a fourth prong of an FAS diagnosis).

diagnosis of FAS when the three prongs are established.[94] The PCRA court also ignored the unrebutted evidence of record that Flor's mother in fact consumed alcohol during pregnancy.[95] The PCRA court also rejected the testimony of Dr. Patton, who concluded that Flor demonstrated intellectual and adaptive deficits in childhood. The PCRA court was not persuaded by Dr. Patton because Dr. Patton's conclusion rested upon information provided by Flor's step-sister, Stacey Gilbert, who the PCRA court did not believe to be a reliable source of information.[96]

The PCRA court rejected the testimony of Dr. Novick-Brown, a psychologist who conducted a "lifelong functional assessment" of Flor and testified concerning Flor's adaptive deficits, which she believed may stem from an FAS diagnosis.[97] According to the PCRA court, Dr. Novick-Brown's testimony was not credible because it was based upon hearsay, unverified assertions, and generalizations, and because the purported adaptive deficits were inconsistent with Flor's ability to write letters, submit court filings, and obtain employment.[98]

The PCRA Court found that this testimony was undermined by the lack of a diagnosis of FAS or intellectual disability in 2006.[99] Although this is accurate, it is also of no moment. The current evidence of record is unrebutted. It persuasively established the present diagnosis of FAS as the etiological basis of Flor's intellectual disability.

---

[94]     N.T., 6/26/2014, at 34-35, 63-67.

[95]     N.T., 6/26/2014, at 99-100.

[96]     PCRA Ct. Op. at 55.

[97]     *Id.* at 81; N.T., 1/22/2015, at 15, 24-25, 31.

[98]     PCRA Ct. Op. at 82-85.

[99]     *Id.* at 78, 87-90.

The Majority holds that the PCRA court did not err in discounting Flor's FAS diagnosis because Flor's 2006 experts "were aware of the symptoms and risk factors [of FAS] but never found them implicated."[100]  But Drs. Mack, Tepper, and Voskanian were not qualified to assess FAS, and, in 2006, were under the incorrect belief that Flor had obtained his GED, a fact that would be inconsistent with FAS.  Dr. Dougherty informed trial counsel that Flor possessed facial features consistent with FAS, but engaged in no further analysis of this possibility because he was not qualified to do so.  More broadly, the assertion that simply being a medical doctor and observing Flor was sufficient grounds to suspect or rule out FAS is dubious and unsupported.  FAS is diagnosed after an assessment by medical doctors who are trained FASD diagnosticians.  None of the sentencing-phase experts here had received this training.  The failure of defense experts to recognize and diagnose FAS in 2006 does not bear upon the later, unrebutted diagnosis.

To the extent that the PCRA court, and now the Majority, discount Dr. Davies' FAS diagnosis because there were other explanations for Flor's behavioral and learning issues,[101] such other explanations do not account for the constellation of co-occurring features that comprise the FAS diagnosis: specific facial features, growth impairments, and neuropsychological impairments.  Because these three factors do not align without FAS, it is not necessary to rule out other factors contributing to Flor's deficits.

As the Majority observes, the PCRA court also held that Dr. Davies was not credible because he did not follow the usual process to diagnose Flor with FAS.[102]  As

---

[100]    Maj. Op. at 47.

[101]    *Id*. at 34.

[102]    *Id.*

Dr. Davies testified, in clinical practice, a diagnostician determines if FAS is present, and team members assess the functional effect of the diagnosis.[103]  Here, Dr. Davies was the diagnostician making the determination of whether FAS was present based upon the factors identified above.  The absence of a team of experts to assess Flor's functionality does not undermine Dr. Davies' FAS diagnosis.

The Majority views the PCRA court's consideration of Flor's FAS diagnosis as bearing only upon the credibility of the experts who changed their opinion between 2006 and the PCRA proceedings, particularly given what the Majority perceives as uncertainty surrounding Flor's IQ score.[104]  Even if the FAS diagnosis is relevant only to the extent it pertains to the age of onset prong, the FAS diagnosis was unrebutted by the Commonwealth.

Similarly, in rejecting evidence of intellectual disability, the PCRA court particularly was persuaded by the absence of an intellectual disability diagnosis by Drs. Voskanian, Tepper, and Mack at the penalty phase.  According to the PCRA court, these experts had no valid basis to change their mind or "recant" their prior testimony.[105]  The PCRA court believed that their "recantation" rendered their PCRA testimony non-credible.[106]  Upon this basis, the PCRA court rejected this PCRA testimony.

Flor argues persuasively that these three experts diagnosed him with intellectual disability in connection with post-conviction proceedings because of new evidence and the current diagnostic criteria, which has evolved since 2006, and that their post-conviction testimony is therefore more accurate than their 2006 testimony.  Pursuant to

---

[103]    *See* N.T., 1/22/2015, at 34.

[104]    Maj. Op. at 47-48.

[105]    PCRA Ct. Op. at 128-132.

[106]    *Id.*

*Moore-I*, Flor is correct. *Atkins* claims must be decided using the most current diagnostic standards.[107] The 2006 findings were not based upon current diagnostic criteria, but upon the criteria that existed in 2006. Since then, the prevailing diagnostic criteria have been revised to reflect significant advancements within the medical community.

Flor argues convincingly that, since 2006, the diagnostic criteria have evolved to include consideration of the Flynn Effect; to reject rigid IQ cutoffs; to embrace the clinical assessment of intellectual functioning; to include the AAIDD's description of commonly held but erroneous stereotypes; to include the DSM-5's emphasis upon the failure to reach age-related expectations as the benchmark of adaptive behavior; to include the DSM-5's clinical description for deficits in each domain of adaptive functioning; to focus upon clinical judgment in assessing adaptive functioning; to reflect the DSM-5's rejection of the use of group-administered testing in assessing intellectual functioning; and to emphasize the comprehensive nature of adaptive behavior assessments.[108]

In addition to changes in diagnostic criteria, Flor's post-conviction expert witnesses also had the benefit of additional evidence regarding Flor's adaptive deficits, his FAS diagnosis, and his lack of a GED (contrary to what these experts believed at the time of sentencing), all of which they lacked at the time of sentencing. Far from indicating that certain witnesses recanted their prior testimony in an effort to save Flor from a death sentence, the record evidence demonstrates a good faith reassessment under advanced diagnostic criteria and additional evidence.

Moreover, Flor presented two experts to the PCRA court (Dr. Martell and Dr. Dougherty) who testified for the first time in this case that Flor is intellectually disabled,

---

[107]     *Moore-I*, 137 S.Ct. at 1049, 1052-53.

[108]     Def. Ex. 24, DSM-5, at 34, 37-38; Maj. Op. at 19 (citing Appellant's Br. at 82).

and who offered voluminous evidence in support of their diagnosis of intellectual disability.[109]   The PCRA court's credibility findings as to Drs. Mack, Tepper, and Voskanian, which were based upon the changing of their minds, have no bearing upon the credibility of these expert witnesses.  The same bases for discredit cannot be lodged against Drs. Martell and Dougherty.

The PCRA court separately rejected Dr. Martell's testimony for a number of reasons that are not supported by the record.[110]  In particular, the PCRA court was critical of Dr. Martell's application of the Flynn Effect in high stakes settings.  As discussed herein, the AAIDD and the APA require IQ scores to account for the Flynn Effect.  The PCRA court was also concerned that Dr. Martell had not reduced Flor's IQ score to account for depression.[111]  Although depression may impact IQ scores, there was no evidence that Flor's score was impacted by depression.  More broadly, as noted, the Commonwealth conceded the validity of Dr. Mack's 2006 testing, and there was no dispute that Flor's IQ established the first prong of intellectual disability.

Contrary to the conclusions of the PCRA court, the record contains ample evidentiary support for Flor's diagnosis of intellectual disability.  Given the magnitude of the constitutional right at stake, I am persuaded that the PCRA court's findings are not supported by the record, are premised upon legal error, and create the unacceptable, and unconstitutional, risk that a person with intellectual disability will be executed.

The Majority repeats many of the errors of the PCRA court by relying upon findings that are not supported by the record and by ignoring evidence premised upon current

---

[109]    N.T., 9/14/2017, at 93-187; N.T., 9/15/2017 at 3-9; N.T., 2/8/2018, at 21-138, N.T., 5/10/2018, at 4-91.

[110]    *See* Maj. Op. at 37-38.

[111]    *Id.* at 38.

diagnostic criteria.  Like the PCRA court, the Majority also makes a number of legal errors with which I cannot agree.  For instance, the Majority dismisses the PCRA testimony of Drs. Mack, Tepper, and Voskanian because those experts did not attribute their post-conviction diagnosis to changes in diagnostic criteria.[112]  Whether or not these experts attributed their change of mind to evolving medical standards, the fact remains that they reached a different conclusion in post-conviction proceedings under current criteria and new evidence, including the diagnosis of FAS, information pertaining to Flor's adaptive functioning, and learning that Flor had lied about obtaining his GED.  Additional experts and evidence corroborated their post-conviction testimony and diagnoses.

The Majority also suggests that expert witnesses who testify at the penalty phase cannot credibly change their minds.[113]  I disagree.  Although an expert's change of mind may not be credible in a particular case (perhaps because the reason is not persuasive or it is not premised upon new evidence or evolving scientific standards), I would not categorically impugn the credibility of an expert who has the courage to reexamine his or her prior testimony and correct any inaccuracies or outdated opinions.  The Majority's suggestion would discourage the very self-reflection and reconsideration of prior conclusions that scientific progress demands.  Recall as well that the experts here did not change their minds on a whim.  Their good-faith reconsiderations were based upon an altered medical landscape and upon consideration of evidence that they did not possess at the time of their earlier involvement in the case.

The Majority also downplays the significance of the advances in diagnostic criteria, asserting that these advances would not have led to different diagnoses at the time of the

---

[112]     *Id.* at 20.

[113]     *Id.* at 14 (observing that a "shift in opinion may call into question the experts' professional performance").

PCRA hearing.[114] Once more, I cannot agree. Following Flor's penalty phase, the AAIDD and the APA collectively issued five additional clinical manuals that announced and incorporated the significant advances that I have described above. In accord with *Moore-I,* an *Atkins* determination must be premised upon current diagnostic guidelines from the medical community. The 2006 findings were not based upon current diagnostic criteria.

The overwhelming evidence of record demonstrates that Flor is, in fact, intellectually disabled. Flor is not eligible for the sentence that he currently is serving. He has established deficits in intellectual functioning, adaptive deficits, and onset before the age of eighteen. These deficits are corroborated by several known risk factors for intellectual disability. The PCRA court's rejection of this claim is not supported by the record but was, instead, the product of the PCRA court's disregard for current diagnostic criteria and adherence to practices that have been rejected by the Supreme Court of the United States. Although the PCRA court has the discretion to assess the credibility of experts, it has no discretion to reject current diagnostic standards.[115] I conclude, based upon the record before this Court, that the PCRA court erred and that Flor is entitled to relief on his *Atkins* claim. The Majority's affirmance of the PCRA court has created an unacceptable risk that persons with intellectual disability will be executed.

II. *Atkins* - Reviewability

A. Waiver - PCRA Petition

In affirming the PCRA court, the Majority reaches a number of erroneous legal conclusions. The Majority holds that Flor's substantive claim for relief under *Atkins* is

---

[114]     *Id.* at 20-21.

[115]     *Moore-I*, 137 S.Ct. at 1053 ("The medical community's current standards supply one constraint on the States' leeway" to fashion criteria for establishing whether a capital defendant is intellectually disabled.).

waived because it was not included in Flor's PCRA petition as a stand-alone issue.[116]

Although Flor did not separately number his substantive *Atkins* claim, he included it within the first issue presented in his PCRA petition. This issue asked, in relevant part, whether "Petitioner is ineligible for the death penalty under *Atkins v. Virginia* and its progeny."[117] Flor plainly asserted that he is presently ineligible for the death penalty. By ignoring this language, or seeming to require this issue to be separated from the *Atkins*-based counsel ineffectiveness claim, the Majority requires too much and reads the issue too narrowly. There is no statutory or rule-based requirement demanding what the Majority now requires. Here, the issue was preserved, there is a developed record, and there are findings of fact by the PCRA court. The case is without question ripe for review. Additionally, an *Atkins* claim is a challenge to the legality of the sentence.[118] It is not subject to waiver.[119] Accordingly, there is no issue preservation impediment to our review.

### B. Cognizability under 42 Pa.C.S. § 9543(a)(2)(i)

The Majority also is critical of Flor's reliance upon 42 Pa.C.S. § 9543(a)(2)(i) and (vii) to assert that the substantive *Atkins* claim is cognizable.[120, 121] A claim is cognizable

---

[116]   Maj. Op. at 19.

[117]   *Id.* at 19 (citing PCRA Ct. Op. at 44).

[118]   *Atkins*, 536 U.S. at 321 (explaining that "the [United States] Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender" (citation omitted)); *Commonwealth v. Robinson*, 82 A.3d 998, 1020 (Pa. 2013) ("*Atkins* claims implicate the legality of sentencing.").

[119]   *Commonwealth v. McIntyre*, 232 A.3d 609, 616 (Pa. 2020) (recognizing that a claim implicating the legality of a sentence is not subject to waiver).

[120]   *See* Maj. Op. at 21-23.

[121]   Section 9543(a) provides, in relevant part, as follows:

under Section 9543(a)(2)(i) where it alleges that the conviction or sentence resulted from a constitutional violation that undermines the truth-determining process. *Atkins* held that subjecting the intellectually disabled to the death penalty is unconstitutional.[122] I have little difficulty agreeing with Flor that, under Section 9543(a)(2)(i), a death sentence imposed upon an individual who legally is ineligible for that sentence is a sentence that results from a constitutional violation.

I am also unpersuaded by the Majority's waiver analysis of the *Atkins* claim under Section 9543(a)(2)(i).[123] According to the Majority, Flor was required to raise his *Atkins*

---

(a) General rule.--To be eligible for relief under this subchapter, the petitioner must plead and prove by a preponderance of the evidence all of the following:

\* \* \*

(2) That the conviction or sentence resulted from one or more of the following:

(i) A violation of the Constitution of this Commonwealth or the Constitution or laws of the United States which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

\* \* \*

(vi) The unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced.

(vii) The imposition of a sentence greater than the lawful maximum.

42 Pa.C.S. § 9543(a).

[122]    *Atkins*, 536 U.S. at 321.

[123]    Maj. Op. at 22-23.

claim at sentencing, lest he waive it forever. But why? Flor's claim is that he presently is ineligible for the sentence that he is currently serving as a matter of constitutional law. *Atkins* supports this claim, rendering the intellectually disabled ineligible for the death penalty. Under *Atkins* and its progeny, as explained above, a determination of intellectual disability is premised upon standards that develop within the medical community. As these standards continue to evolve, it is the most current standards that determine a present diagnosis of intellectual disability. The question is not whether Flor could have been diagnosed with intellectual disability at sentencing, but whether he is, in fact, intellectually disabled according to current medical diagnostic standards. Flor's failure to raise this claim at the penalty phase is irrelevant. This is especially true because Flor's *Atkins* claim implicates the legality of the sentence and is not subject to waiver.

The Majority attempts to bolster its waiver analysis with a citation to *Commonwealth v. Mason*, 130 A.3d 601, 666 (Pa. 2015), for the proposition that declining to bring an *Atkins* claim at sentencing waives this claim forever, even in a timely-filed post-conviction petition.[124] The issue in *Mason* concerned a disagreement between the defendant and his counsel as to whether to pursue an *Atkins* claim, where counsel sought to bring the claim and the defendant did not. The question this Court addressed on appeal was whether the PCRA court erred when it permitted the defendant to override counsel's decision to request an *Atkins* hearing.[125] Answering this question, we observed that the defendant bears the burden of proving intellectual disability. It followed that the defendant, not counsel, could choose whether to bring the *Atkins* claim or forego it.[126] Our allocation of the decision-making authority over whether to raise an *Atkins* claim

---

[124] Maj. Op. at 22.

[125] *Mason*, 130 A.3d at 666.

[126] *Id.*

where a defendant has sought counsel's assistance in vacating a death sentence does not, as the Majority now asserts, mean that a defendant who did not raise an *Atkins* claim at sentencing is barred from doing so in post-conviction proceedings.

Additionally, Flor's PCRA-*Atkins* claim is distinct from any claim that he could have raised in 2006. The claim is premised upon current medical standards rather than the standards that existed in 2006. Therefore, the grant of substantive relief under *Atkins* in a timely post-conviction petition does not depend upon whether the petitioner investigated or presented an *Atkins* claim at sentencing. Rather, as a diagnosis is premised upon current diagnostic criteria, shutting the door to stand-alone *Atkins* claims in timely post-conviction petitions could result in the execution of the intellectually disabled in direct violation of *Atkins* and its progeny. Subjecting Flor to the death penalty, a sentence for which he is not eligible, would be a constitutional violation. The illegality of this sentence undermines the truth-determining process under Section 9543(a)(2)(i).

### C. Cognizability under 42 Pa.C.S. § 9543(a)(2)(vii)

The Majority also holds that Section 9543(a)(2)(vii), which is implicated where the sentence is greater than the lawful maximum, is inapplicable.[127] Again, I must disagree. *Atkins* held that "persons with intellectual disability may not be executed."[128] *Moore-I* held that *Atkins* claims must be decided in accordance with the medical community's current standards.[129] Using current standards, the evidence of record demonstrates that Flor is not subject to the death penalty. Barring Flor from presenting his *Atkins* claims at this

---

[127]   *Id.* at 23.

[128]   *Hall*, 572 U.S. at 08 (citing *Atkins*, 536 U.S. at 321).

[129]   *Moore-I*, 137 S.Ct. at 1049, 1053 (citing manuals from the AAIDD and the APA and holding that "[r]eflecting improved understanding over time, . . . current manuals offer the best available description of how mental disorders are expressed and can be recognized by trained clinicians").

juncture, when Flor is before the court on appeal from a timely-filed PCRA petition alleging a current ineligibility for the death penalty, would deprive Flor of the only opportunity that he has to present his claim using the current diagnostic standards, and would therefore run afoul of *Moore-I*. Because Flor is not eligible for the death penalty, he is serving a sentence greater than the lawful maximum. The claim, therefore, is cognizable under Section 9543(a)(2)(vii).

### D. Cognizability under 42 Pa.C.S. § 9543(a)(2)(vi)

Although Flor does not invoke Section 9543(a)(2)(vi) as a basis of cognizability, the Majority invokes it only to reject it.[130] This subsection applies where the conviction results from the unavailability at the time of trial of exculpatory evidence that has since become available. Because Flor does not rely upon this section, there is no need for the Majority to address it. But because the Majority is closing the door on this avenue of redress in a case where it is not at issue, I am compelled to respond.

We have never interpreted Section 9543(a)(2)(vi) as narrowly as the Majority does today, opining in *dicta* that advances within the medical community are not evidence, but rather the norms by which evidence is evaluated.[131] If the issue were before the Court, perhaps there would be a persuasive argument that "exculpatory evidence" includes evidence of sentencing illegality, which essentially is what a post-conviction diagnosis of intellectual disability is. After all, if Flor is, in fact, intellectually disabled, then he was, *ipso facto*, intellectually disabled at the time of trial. The only difference is that now the experts have at their disposal evolved diagnostic criteria to make this diagnosis.

At issue here is an *Atkins* claim that is not presented in the context of an allegation of ineffective assistance of counsel before a court of competent jurisdiction. The Majority

---

[130]   Maj. Op. at 23.

[131]   *Id.*

effectively is holding that such a claim can never be raised in a PCRA petition, unless it is conjoined with an ineffectiveness claim. There is no justification for this sweeping, revolutionary analysis. Although any particular petitioner may lose on the merits, a stand-alone *Atkins* claim clearly is cognizable under the PCRA.

### III. Prosecutorial Misconduct

Given my resolution of the merits of the stand-alone *Atkins* claim, I would not resolve the *Atkins*-based ineffectiveness claim or proceed to address the remaining sentencing phase issues. However, because I differ with the Majority's resolution of another of Flor's claims, I will note my disagreement.

Flor argues that trial counsel was ineffective for failing to object to certain instances of prosecutorial misconduct. One such comment implicates *Caldwell v. Mississippi*, 472 U.S. 320, 323 (1985), in which the United States Supreme Court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." Applying *Caldwell* in *Commonwealth v. Montalvo*, 205 A.3d 274 (Pa. 2019), this Court held that it was reversible error for the prosecutor to characterize the jury's role as merely advisory. We addressed the arguable merit prong of the ineffectiveness standard and held that prosecutorial statements amounting to alleged *Caldwell* violations "must be viewed in light of the circumstances of the particular case to determine if those comments created a risk that the jury's deliberations and death penalty sentence were tainted by impermissible considerations."[132] The prosecutor in *Montalvo* erroneously referred to the jury's verdict

---

[132] *Montalvo*, 205 A.3d at 298–99 (citing *Commonwealth v. Smith*, 650 A.2d 863, 869 (Pa. 1994)).

as a recommendation a number of times.[133]  Compounding these erroneous assertions, the trial court expressly conveyed to the jury, "I am the sentencing person. Your decision is a recommendation to the court."[134]  Although the trial court later instructed the jury correctly in accord with the law, "nothing in the trial court's final charge made clear to the jury that one of the contradictory instructions was erroneous."[135]  Merely to contradict a constitutionally infirm instruction, without explanation, fails to cure the constitutional error.[136]

At Flor's trial, the prosecutor informed the jury falsely that the jurors did not "hold the power of life and death in [their] hands."[137]  The prosecutor later explained that the "law sets the factors out. . . .  The law has [decided the issue of life and death] years before you entered into this courtroom."[138]

Although trial counsel did not object, counsel informed the jury that the prosecutor was incorrect:  "[The prosecutor] is not quite accurate on the law.  The decision of life and death is in your hands.  You are the deciders.  You decide the weight to give to the mitigating, and you decide the weight to the aggravating."[139]  The trial court later instructed the jury in accord with the law that their verdict would not be a recommendation, but would establish Flor's sentence.[140]

---

[133]    *Id.* at 295.

[134]    *Id.* at 299.

[135]    *Id.*

[136]    *Id.*

[137]    Maj. Op. at 53 (citing Appellant's Br. at 116 (quoting N.T., 11/16/2006, at 78-79)).

[138]    *Id.* at 54 (citing Commonwealth's Br. at 132 (citing N.T., 11/6/06, at 79)).

[139]    *Id.* (citing Commonwealth's Br. at 134 (citing N.T., 11/6/2006, at 105)).

[140]    *Id.* (citing Commonwealth's Br. at 134 (citing N.T., 11/17/2006, at 35)).

The Majority holds that the prosecutor's comments did not indicate that the jury's role was advisory or that it was not responsible for determining the sentence.[141]  This cannot be true.  By telling the jurors that they did not hold the power of life or death, the prosecutor wrongly left the jury with the impression that it was not responsible for fixing the sentence.  The prosecutor's later statement that the law, not the jury, established Flor's sentence could only serve to confuse the jury further.  Prosecutors have an obligation not to confuse jurors by misleading them about their role in the sentencing process, in accord with *Caldwell* and its progeny.  The prosecutor ran afoul of this obligation.

We do not view the prosecutor's error in isolation, but consider the impact of the prosecutor's erroneous comments in light of the particular circumstances of the case, including the trial court's jury instructions.[142]  Although the prosecutor made an inaccurate statement that diminished the jury's role in sentencing, the trial court later provided an accurate instruction informing the jury that the jury was responsible for reaching a sentencing verdict.  Because the trial court's instructions provided an accurate recitation of the law, and because we presume that jurors follow the trial court's instructions,[143] I ultimately agree with the Majority that Flor is not entitled to sentencing relief on this claim.

This case is distinguishable from *Montalvo* because here, the trial court consistently and accurately explained the law.  In *Montalvo*, the prosecutor confused and misled the jury, and the trial court compounded this misconduct by giving conflicting instructions about the jury's role.  Although the *Montalvo* court's instructions later clarified

---

[141]     *Id.*

[142]     *Montalvo*, 205 A.3d at 298-99.

[143]     *Commonwealth v. Aikens*, 168 A.3d 137, 143 (Pa. 2017); *Commonwealth v. Bullock*, 913 A.2d 207, 218 (Pa. 2006).

the role of the jury, the correct instruction was insufficient to cure the confusion that was likely to have resulted from the prior, erroneous instruction because the trial court did not acknowledge its prior error.[144]  Without acknowledging the prior error, that latter, correct instruction was unlikely to ameliorate the confusion.  Here, there is no allegation that the trial court, at any time, misled or confused the jury with respect to its role.  Unlike the circumstances in *Montalvo*, the trial court here cured the prosecutor's error.

* * *

In summary, I would reverse the PCRA court's resolution of Flor's substantive *Atkins* claim.  I believe that the PCRA court's factual findings were not supported by the record and that its legal conclusions were tainted by legal error.  The Majority's affirmance compounds these errors.  I respectfully dissent.

Justice Todd and Justice Donohue join this dissenting opinion.

Justice Saylor joins Parts II and III of this dissenting opinion.

---

[144]     *Montalvo*, 205 A.3d at 299.